**UNITED STATES of America, Plaintiff,**

**v.**

**SHELL OIL COMPANY, Defendant.**

**Civ. A. No. 83–C–2379.**

United States District Court,
D. Colorado.

March 26, 1985.

F. Henry Habicht, II, Mary L. Walker, Carol Lynn Green, Robert L. Baker, Mark E. Grummer, Catherine McCabe, Mark P. Fitzsimmons, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Edward J. McGrath, A. Edgar Benton, Daniel Hoffman, Denver, Colo., for Shell Oil Co.

Robert A. Hykan, Richard L. Griffith, Janice L. Burnett, Asst. Attys. Gen., Natural Resources Section, Denver, Colo., for Colorado.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

The United States of America filed this action against the Shell Oil Company under sections 104 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9604 and 9607. The United States seeks to recover costs it has incurred, and will incur, in responding to hazardous waste contamination allegedly caused by the Shell Oil Company at the Rocky Mountain Arsenal near Denver, Colorado. The United States also seeks damages for the injury, destruction or loss of natural resources at the Arsenal. Jurisdiction is founded on 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b).

Before me at this time are four motions filed by Shell: (1) a motion for partial dismissal of the first claim for relief, (2) a motion to join the United States Department of the Army as a defendant, (3) a motion to join the State of Colorado as a plaintiff, and (4) a motion to reconsider my September 14, 1984 denial of Shell's motion to strike from the complaint allegations stating the amounts claimed as damages. The motions have been thoroughly briefed, and oral argument has been heard on the first three. No useful purpose would be served by oral argument on the fourth.

### I. *Background Facts.*

The facts here stated are as the United States has alleged them in the complaint. Familiar law requires that, for purposes of these motions, I must accept as true the facts alleged in the complaint.

The Rocky Mountain Arsenal is located in Adams County, Colorado, approximately ten miles northeast of the center of downtown Denver. It covers approximately twenty-seven square miles. (Complaint para. 7.) The United States has owned the Arsenal property since 1942. (Complaint para. 8.) The United States Department of the Army has used various portions of the Arsenal for the manufacture, testing, demilitarization, disposal and other handling of various chemical agents and munitions. (Complaint para. 11.) Since 1947, the United States has leased certain property within the Arsenal to Shell and its predecessors for the manufacture, packaging and other handling of pesticides, herbicides and other chemicals. (Complaint paras. 13, 14, and 17.)

The Army's wastes and all or some portion of Shell's wastes were disposed of through a common sanitary sewer system and common contaminated waste disposal system built and operated by the Army. (Complaint paras. 16, 19, 22, 25, 28, 29.) The waste disposal systems failed and released into the environment hazardous substances comprised of commingled wastes generated by the Army, Shell and other Arsenal tenants. (Complaint paras. 26–28.) The released chemicals have killed migratory and other birds, fish and wildlife, have contaminated air, land, ground water, lakes and other surface waters within the Arsenal, and have contaminated or threaten to contaminate the environment outside the Arsenal. (Complaint paras. 30, 33.)

In 1975, the State of Colorado issued administrative orders to the Army and Shell directing them to cease and desist certain discharges of chemicals, to clean up all sources of certain chemicals, and to undertake a ground water monitoring program. (Complaint para. 34.)

In 1975, the Army commenced investigation and testing to determine the existence, extent and sources of contamination at the Arsenal. (Complaint para. 37.) At that time the Army also commenced response action to prevent or control migration of chemicals off the Arsenal property and to prevent exposure of the public to chemicals. (*Id.*)

In 1982, the Army, the United States Environmental Protection Agency, the State of Colorado and Shell entered into a Memorandum of Agreement regarding removal, remedial and other response actions taken or planned by the Army. (Complaint para. 39.)

As of December 1, 1983, the Army had incurred expenses of approximately $48,000,000 in responding to releases or threatened releases of hazardous chemicals at the Arsenal. (Complaint para. 40; October 3, 1983 claim letter, Exhibit A to the Complaint.)

The Army has been developing a comprehensive response plan for cleanup of the arsenal. In its January 1984 Draft Decontamination Assessment for Land and Facilities at the Rocky Mountain Arsenal, the Rocky Mountain Arsenal Contamination Control Program Management Team outlined four alternative cleanup programs, with costs ranging from $210,000,000 to $1,860,000,000. The Army has proposed to implement option one, costing approximately $360,000,000, but no plan has been finally approved. (October 23, 1984 letter from F. Henry Habicht II, Assistant Attorney General, Land and Natural Resources Division, Department of Justice.)

## II. *Synopsis of CERCLA.*

CERCLA was enacted on December 11, 1980 to establish a comprehensive response and liability mechanism to control and clean up releases into the environment of hazardous substances, and to provide compensation for costs incurred in responding to the releases and for damage to natural resources. A brief synopsis of CERCLA provisions referred to in this opinion and order will be helpful in understanding the order.

Section 104, 42 U.S.C. § 9604, provides for government response to the release of a hazardous substance. Section 105, 42 U.S.C. § 9605, directs the President to revise the National Oil and Hazardous Substances Pollution Contingency Plan, originally prepared under the Federal Water Pollution Control Act, 33 U.S.C. § 1321, to effectuate the new responsibilities and powers created by CERCLA.

Under § 106, 42 U.S.C. § 9606, the President is authorized to commence an enforcement action to abate an actual or threatened release of a hazardous substance when there may be an imminent and substantial endangerment to the public health or welfare, or to the environment. Section 107, 42 U.S.C. § 9607, provides for liability of certain responsible parties for costs incurred in responding to releases of hazardous substances and for injury to natural resources.

Section 221, 42 U.S.C. § 9631, establishes a $1.6 billion fund, commonly known as the "Superfund," to be used to remedy or prevent releases or threatened releases of hazardous substances into the environment. Section 111, 42 U.S.C. § 9611, governs uses of the Fund and § 112, 42 U.S.C. § 9612, sets forth the procedure for making claims against the Fund.

## III. *Motion of Shell Oil Company for Partial Dismissal of First Claim for Relief.*

In its first claim for relief, the United States alleges, among other things, that Shell is liable under CERCLA § 107, 42 U.S.C. § 9607, for all or a substantial portion of the response costs (totalling approximately $47,800,000) incurred by the United States in responding to releases of Shell chemicals at the Rocky Mountain Arsenal. (Complaint para. 55.) This figure includes response costs incurred *before* the effective date of the Act, December 11, 1980. Shell has moved, pursuant to Rule 12(b)(6), Fed. R.Civ.P., to dismiss this first claim for relief to the extent that it seeks recovery for response costs incurred by the Army prior to December 11, 1980.

Shell argues that CERCLA does not apply retroactively to authorize recovery of response costs incurred before enactment of CERCLA. Three district courts that have addressed this issue have reached results supporting Shell's position. *United States v. Northeastern Pharmaceutical and Chemical Co.*, 579 F.Supp. 823, 841–843 (W.D.Mo.1984); *United States v.*

*Wade,* 20 E.R.C. 1849, 1850–51 (E.D.Pa. March 23, 1984); *United States v. Morton-Thiokol, Inc.,* No. 83–4787 (D.N.J. July 2, 1984). Neither the Supreme Court nor any other federal appellate court has addressed this retroactivity issue. Therefore, it is necessary to examine CERCLA's language and legislative history to determine whether the result reached in the three cited district court cases comports with the intent of Congress.

 My analysis must begin by acknowledging the presumption against retroactive application of statutes. *See* 2 J. Sutherland, *Statutes and Statutory Construction* § 41.04 (4th ed. 1973). In *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982), the Supreme Court reaffirmed that "a retrospective operation will not be given to a statute which interferes with antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature'" (quoting *Union Pacific R. Company v. Laramie Stock Yards Company,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913)). Thus the first step must be scrutiny of the statutory language to determine whether Congress, in CERCLA, has overridden the usual presumption against retroactive application. Only if a statute is unclear may a court turn to legislative history for guidance in interpreting it. *See State of Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1308–09 (N.D. Ohio 1983).

The following language of CERCLA's liability section, § 107(a), 42 U.S.C. § 9607(a), is here at issue:

"(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a ... facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, *shall be liable for* —

(A) *all costs of removal or remedial action incurred* by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." (Emphasis added.)

This provision on its face neither explicitly provides for recovery of response costs incurred before CERCLA's enactment nor explicitly limits recovery only to costs incurred after its enactment.

As there is no explicit statement of Congressional intent to hold responsible parties liable for pre-CERCLA response costs, I must determine whether such an intent is revealed in other statutory provisions or in the legislative history. Before turning to a close analysis of specific statutory provisions and their accompanying legislative history, I will review the general purpose and scheme of CERCLA.

*A. Purpose and Scheme.*

 It must be remembered that:

"[a] statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus it is not proper to confine interpretation to the one section to be construed.

\* \* \* \* \* \*

The presumption is that the lawmaker has a definite purpose in every enactment and has adapted and formulated the subsidiary provisions in harmony with the purpose.... From this assumption proceeds the cardinal rule that the general purpose, intent or purport of the whole act shall control, and that all the parts be interpreted as subsidiary and harmonious." 2A J. Sutherland, *Statutes and Statutory Construction* § 46.-05 (4th ed. 1984).

Additionally, CERCLA must be construed in light of previous statutes relating to environmental pollution, notably the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901 *et seq. See* 2A J. Sutherland, *Statutes and Statutory Construction*, § 51.02 (4th ed. 1984).

Congress commenced the modern era of federal environmental regulation with the Clean Air Act Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676, now codified as amended at 42 U.S.C. §§ 7401 *et seq.*, and the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 816, 33 U.S.C. §§ 1251–1376. Congress thereafter recognized that no federal statute regulated the disposal of environmental pollutants, including solid wastes and hazardous wastes, *on land.* In order to close this regulatory gap, Congress in 1976 enacted the Resource Conservation and Recovery Act ("RCRA"), Pub.L. No. 94–580, 90 Stat. 2795, codified as an amendment to the Solid Waste Disposal Act, 42 U.S.C. §§ 6901 *et seq.* In its report on RCRA, the House Committee on Interstate and Foreign Commerce stated:

"The Committee believes that the approach taken by this legislation eliminates the last remaining loophole in environmental law, that of unregulated land disposal of discarded materials and hazardous wastes. Further, the Committee believes that this legislation is necessary if other environmental laws are to be both cost and environmentally effective. At present the federal government is spending billions of dollars to remove pollutants from the air and water, only to dispose of such pollutants on the land in an environmentally unsound manner. The existing methods of land disposal often result in air pollution, subsurface leachate and surface run-off, which affect air and water quality. This legislation will eliminate this problem and permit the environmental laws to function in a coordinated and effective way." H.R.Rep. No. 94–1491, 94th Cong., 2d Sess. 4, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6238, 6241–42.

RCRA provides for the promulgation of regulations by the Environmental Protection Agency applicable to generators of hazardous waste, transporters of hazardous waste, and owners and operators of hazardous waste treatment, storage and disposal facilities. The regulations establish requirements respecting, among other things, record keeping practices, labeling practices, use of appropriate containers, use of a manifest system, and the design, construction, operation and maintenance of facilities. (42 U.S.C. §§ 6921–34; 40 C.F.R. Parts 260, 261, 262, 263, 264, 265, 266, 267 and 270.)

Congress discovered soon after RCRA, however, that its work was not complete. Land pollution presented a problem not encountered with air and water pollution. Air and navigable waters are, generally speaking, self-cleansing through time. Carbon monoxide in air and phosphates in water can thus be abated by limiting or eliminating present sources of pollution. But hazardous wastes deposited on land do not simply disperse into harmless concentrations. They can percolate through the soil and infiltrate ground water; and they can persist over long periods of time. Con-

gress, faced with sites such as Love Canal, clearly understood that the mere regulation of current land disposal would not adequately protect the public health and welfare or the environment.

CERCLA was enacted in 1980 to provide for "the cleanup of inactive hazardous waste disposal sites." (Preamble to CERCLA, Pub.L. No. 96–510, 94 Stat. 2767.) The House Committee on Interstate and Foreign Commerce reported that it was their intent in CERCLA "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." (H.R.Rep. No. 96–1016, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Ad.News 6119, 6125 [to accompany H.R. 7020] (hereafter "House Report").) The background and need for CERCLA are explained in the House Report as follows:

"Over the past two decades, the Congress has enacted strong environmental legislation in recognition of the danger to human health and the environment posed by a host of environmental pollutants. This field of environmental legislation has expanded to address newly discovered sources of such danger as the frontiers of medical and scientific knowledge have been broadened.

After having previously focused on air and water pollutants, the Congress, in the Resource Conservation and Recovery Act of 1976, provided a *prospective* cradle-to-grave regulatory regime governing the movement of hazardous waste in our society. Since enactment of that law, a major new source of environmental concern has surfaced: the tragic consequences of improperly, negligently, and recklessly [sic] hazardous waste disposal practices known as the *'inactive hazardous waste site problem.'* The unfortunate human health and environmental consequence of these practices has received national attention amidst growing public and Congressional concern over the magnitude of the problem and the appropriate course of response . that should be pursued. *Existing law is clearly inadequate to deal with this massive problem."* (Emphasis added.) House Report at 17–18, 1980 U.S.Code Cong. & Ad.News at 6120.

The Report went on to detail the inadequacies of existing law. Of particular significance to this discussion is the following observation:

"(c) *Deficiencies in RCRA* have left important regulatory gaps.

(1) The Act is *prospective* and applies to past sites only to the extent that they are posing an imminent hazard. Even there the Act is of no help if a financially responsible owner of the site cannot be located." (Emphasis added.) House Report at 22, 1980 U.S.Code Cong. & Ad.News at 6125.

The Senate Report from the Committee on Environment and Public Works, accompanying S.1480, also recognizes that RCRA was not the final solution to the hazardous waste problem. (S.Rep. No. 96–848, 96th Cong., 2d Sess. (1980) (hereafter "Senate Report").) After recounting a number of environmental disasters, including Love Canal, the report concluded:

"There is limited authority to solve these problems. Regulations promulgated in May under subtitle C of the Solid Waste Disposal Act [RCRA], which impose tough new standards for operating toxic waste disposal facilities, are expected to greatly upgrade the Nation's *active toxic waste disposal sites.* But the regulations do not address those situations where an owner is unknown or is unable to pay the cleanup costs, *nor do they address the clean up of* spills, illegal dumping, or *releases generally."* (Emphasis added.)

Senate Report at 10–11.[1]

---

1. Other courts have recognized that CERCLA was enacted in response to the inadequacies of RCRA. *United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. at 839;

*United States v. A & F Materials Company, Inc.,* 578 F.Supp. 1249, 1252 (S.D.Ill.1984); *United States v. Price,* 577 F.Supp. 1103, 1109 (D.N.J. 1983); *United States v. Reilly Tar & Chemical*

Thus, while pre-CERCLA law could prevent further pollution from the contemporary generation and disposal of hazardous wastes, it could not effectively abate the ongoing environmental deterioration resulting from wastes which had been dumped in the past. CERCLA was enacted to address these problems. It is by its very nature backward looking. Many of the human acts that have caused the pollution already had taken place before its enactment; physical and chemical processes are at their pernicious work, carrying destructive forces into the future.

The decision was made in CERCLA to clean up these inactive hazardous waste sites. The next question was who should pay for the cleanup. Congress assigned to the categories of persons listed in § 107(a) the liability for all costs incurred in cleaning up hazardous waste sites. This liability scheme was enacted to assure "that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions." (Senate Report at 13.)

> "[S]ociety should not bear the costs of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dumpsite owner or operator who has profited or otherwise benefited from commerce involving these substances and now wishes to be insulated from any continuing responsibilities for the present hazards to society that have been created." Senate Report at 98.

*See State of Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1312 (N.D.Ohio 1983) (citing additional legislative history and concluding that "there is little doubt that Congress intended for those individuals who were responsible for creating the hazards from these wastes to bear the cost of clean up.")

Courts have faced two separate, though related, issues regarding the retroactive application of CERCLA. The first issue is whether responsible parties are liable under CERCLA for *acts committed before enactment of the statute.* The second issue is the one here presented—whether responsible parties are liable for *government response costs incurred before CERCLA's enactment.* Relying on CERCLA's overriding scheme and purpose, courts have had no difficulty in imposing liability on responsible parties for acts committed before enactment. *United States v. South Carolina Recycling and Disposal, Inc.,* 20 E.R.C. 1753 (D.S.C. February 23, 1984); *United States v. Conservation Chemical Co.,* 589 F.Supp. 59 (W.D.Mo. 1984); *United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. 823; *United States v. A & F Materials Company, Inc.,* 578 F.Supp. 1249 (S.D.Ill.1984); *United States v. Price,* 577 F.Supp. 1103 (D.N.J.1983); *State of Ohio ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300; *United States v. Outboard Marine Corp.,* 556 F.Supp. 54 (N.D.Ill.1982); *United States v. Reilly Tar & Chemical Corp.,* 546 F.Supp. 1100 (D.Minn.1982); *United States v. Wade,* 546 F.Supp. 785 (E.D.Pa. 1982) (off-site generators of wastes disposed of before CERCLA's enactment liable under § 107 but not under § 106).

■ In my view, the first issue is the more difficult issue of the two. Waste generators have argued that it violates due process to hold them liable under § 107(a) for acts committed before CERCLA's enactment. This fairness argument is not frivolous—if they had known at the time they disposed of the wastes that they would one day be liable for the resulting environmental damage, some of them may have acted quite differently. Indeed it may have been significantly less expensive for them to have properly disposed of the wastes initially instead of cleaning up the disposal sites after the fact. Courts which have addressed these arguments have held that retroactive application of § 107(a) to pre-CERCLA conduct does not offend due process. *United States v. South Carolina Recycling and Disposal, Inc.,* 20 E.R.C. at 1761–62; *United States v. Northeastern*

*Corp.,* 546 F.Supp. 1100, 1112 n. 2 (D.Minn. 1982).

*Pharmaceutical and Chemical Co.*, 579 F.Supp. at 840–41. I agree with their reasoning and conclusion.

The issue here raised, whether Shell may be held liable for government response costs incurred before CERCLA's enactment, does not raise the due process issues just discussed.[2] In what way could Shell have acted to reduce its liability in 1975 when the Army commenced cleanup at the Arsenal if it had known that CERCLA would be enacted in 1980? Once it is accepted that Shell may be liable for its pre-CERCLA acts, it is irrelevant, from a due process perspective, whether the government commenced cleanup before or after the Act became law on December 11, 1980. There are no serious due process concerns in holding responsible parties liable for pre-CERCLA response costs.

I conclude that the unavoidably retroactive nature of CERCLA, and Congress' decision in CERCLA to impose the cost of cleaning up hazardous waste sites on the responsible parties rather than on taxpayers, strongly indicate Congressional intent to hold responsible parties liable for pre-enactment government response costs. Such a Congressional intent is consonant with the law's underlying precept that holds parties responsible for damage they cause.

I turn now to an analysis of specific statutory provision.

### B. *Statutory Provisions.*

Shell argues that use of the imperative "shall" in § 107(a)(4)[3] indicates intended prospective operation of the liability provision. Shell cites in support of this argument *Summers v. Skibs A/S Myken*, 191 F.Supp. 929, 930 (E.D.Pa.), *aff'd per curiam*, 296 F.2d 548 (3d Cir.1961). In response, the government points out that all the other verbs in § 107(a) including "costs ... incurred," are in the past tense (with the exception of "accepts"). It has been established that persons who "owned or operated" facilities at which hazardous substances were disposed of, "arranged for disposal" of hazardous substances, or "accepted for transport" any hazardous substances before enactment of CERCLA are liable under § 107(a). To be consistent, the government argues that "costs ... incurred" should also be interpreted to include pre-enactment events.

Both arguments have merit; in effect they cancel each other. In *State of Ohio ex rel. Brown v. Georgeoff*, 562 F.Supp. 1300, Judge Dowd closely analyzed the verb tenses in § 107(a) in an effort to determine whether Congress intended parties to be liable for their acts committed before CERCLA. 562 F.Supp. at 1309–10. He was unable to ascertain Congress',intent regarding retroactivity from the verb tenses in § 107(a), and noted: "The awkwardness of this phrase may be explained by the context of CERCLA's passage. CERCLA was rushed through a lame duck session of Congress, and therefore, might not have received adequate drafting." 562 F.Supp. at 1310, n. 12.

I find and conclude that congressional intent to either impose or withhold liability for response costs incurred before CERCLA cannot be divined from the verb tenses in § 107(a).

Shell asserts as further evidence of Congress' intent § 107(a)'s limitation of recoverable costs to those "not inconsistent with the national contingency plan." The National Contingency Plan ("NCP") is defined by CERCLA as "the national contingency plan published under section 311(c) of the Federal Water Pollution Control Act or revised pursuant to section 105 of this Act." (CERCLA § 101(31), 42 U.S.C. § 9601(31).) The NCP promulgated under the Federal Water Pollution Control Act ("FWPCA") addressed how the government was to respond to discharges of oil and hazardous substances into navigable waters of the

---

**2.** Shell does not directly challenge CERCLA on due process grounds. Shell does argue, however, that the statute should be construed, if possible, to avoid a difficult constitutional issue. *See United States v. Security Industrial Bank*, 103 S.Ct. at 412. In my view no such serious constitutional issue exists.

**3.** Text set forth, *supra*, at p. 1069.

United States.[4] Section 105 of CERCLA, 42 U.S.C. § 9605, directed the President to revise and expand the NCP to effectuate the new responsibilities and powers created by the Act. For example, CERCLA authorizes the President to act whenever any hazardous substances are released or there is a threat of such a release into the "environment." (42 U.S.C. § 9604(a)(1).) "Environment" means not only navigable waters, but any other surface water, ground water, drinking water supply, land surface or subsurface strata or ambient air within the United States or under the jurisdiction of the United States. (42 U.S.C. § 9601(8).) The revised NCP was promulgated July 16, 1982 (47 Fed.Reg. 31180) and is codified at 40 C.F.R. Part 300 (1984).

Shell argues that, in order for costs to be recoverable, response and remedial actions must be consistent with the *revised* NCP. Since the revised NCP was necessarily promulgated after CERCLA's enactment, Shell reasons that only costs incurred after enactment are recoverable. The United States argues in response, relying on the definitional section 101(31) cited above, that § 107(a)(4) refers to *both* the NCP published under the FWPCA *and* to the revised NCP. The government reasons that by defining the NCP to include the original NCP, Congress provided a standard against which costs for response actions that had already commenced at the time of the statute's enactment could be measured. The requirement that response actions be consistent with the NCP, therefore, would not limit recovery to post-CERCLA response costs.

While the NCP was significantly revised and expanded to incorporate the new responsibilities and powers created by CERCLA, I conclude that the original NCP promulgated under the FWPCA could have provided substantial guidance to a court in determining whether responsible parties can properly be held liable for the cost of response actions undertaken by the govern-

ment. More importantly, even assuming that the NCP referred to in § 107(a) is the revised NCP as Shell contends, the provision does not mandate limitation of recovery to costs incurred after CERCLA's enactment. If in 1975 the Army took actions which later turned out to be inconsistent with the revised NCP, the United States cannot now recover those costs; but nothing prevents its recovery of costs later determined to be consistent with the NCP. The consistency requirement addresses the *nature* of the response action for which costs can be recovered, not the *timing* of the action.

Two courts have considered the related issue whether the United States can recover response costs incurred after CERCLA's enactment but before the revised NCP became effective. *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. at 1114–16; *United States v. Wade*, 20 E.R.C. at 1852–53. Under the Act, the revised NCP could not have become effective for at least eight months after enactment. As it turned out, EPA did not publish its final version of the revised plan until July 16, 1982, over a year and a half after CERCLA's enactment. *Reilly Tar* and *Wade* both held that revision of the NCP was not a prerequisite to liability under § 107(a), that is, costs incurred before revision of the NCP are recoverable under CERCLA. In *Wade*, Judge Newcomer reasoned:

"The generator defendants quite properly argue that one purpose in requiring that cleanup measures for which recovery is sought be consistent with the national contingency plan was to ensure evenhanded, responsible, and cost-efficient enforcement of CERCLA. Where they err is in concluding that to permit recovery for costs incurred prior to publication of the plan, but which are in fact consistent with the plan as subsequently published, would somehow undermine this policy. The only danger I foresee in permitting cleanup measures to go forward in the absence of a revised national

---

**4.** The NCP under section 311 of the FWPCA was published on August 13, 1973 (38 Fed.Reg. 21888), revised on February 10, 1975 (40 Fed. Reg. 6282), and revised again on March 19, 1980 (45 Fed.Reg. 17832), 40 C.F.R. Part 1510 (1974 through 1982).

contingency plan is one incurred by plaintiffs. The government will obviously encounter greater difficulty in assessing whether its costs will be recoverable before, as opposed to after, publication of the plan. Provided the national contingency plan is ultimately revised, as it was, and provided costs incurred either before or after publication are not inconsistent with the plan, which remains to be seen in this case, the Congressional concern with restraining agency action will be satisfied. Under such circumstances no defendant can argue it is being saddled with liability for irresponsible agency action contrary to the intent of Congress." 20 E.R.C. at 1852–53.

This reasoning is equally supportive of the conclusion that the NCP consistency requirement does not preclude recovery of costs incurred before CERCLA's enactment.

Shell also relies on § 302(a), 42 U.S.C. § 9652(a), which states: "Unless otherwise provided, all provisions of this Act shall be effective on the date of enactment of this Act [December 11, 1980]." The government argues in response that this is merely a standard "effective date" provision that indicates the date when an action can first be brought and when the time begins to run for issuing regulations and doing other future acts mandated by the statute. The government contends that such *pro forma* language cannot seriously be considered to negate CERCLA's overriding statutory scheme of retroactive liability.

I agree with the government's position. The provision has not been interpreted to prohibit liability from attaching to persons whose pre-CERCLA acts caused hazardous waste contamination. Similarly, I do not interpret § 302(a) to limit liability for response costs to those incurred after December 11, 1980.

While § 107(a) is silent on the issue of retroactive liability for any of the damages recoverable under that section, including response costs, §§ 107(f) and 111(d), 42 U.S.C. §§ 9607(f) and 9611(d), clearly provide specific time limits on recovery for pre-enactment natural resources damages.

Section 107(f) provides, in pertinent part: "In the case of an injury to, destruction of, or loss of natural resources under subparagraph (C) of subsection (a) liability shall be to the United States Government and to any State for natural resources within the State or belonging to, managed by, controlled by, or appertaining to such State.... The President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages. Sums recovered shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal Government or the State government, but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources. There shall be no recovery under the authority of subparagraph (C) of subsection (a) *where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act."* (Emphasis added.)

Section 111(d)(1) similarly provides:

"No money in the Fund may be used under subsection (c)(1) and (2) of this section, nor for the payment of any claim under subsection (b) of this section, where the injury, destruction, or loss of natural resources and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act."

The government argues that if Congress had similarly intended to limit recovery of pre-enactment response costs, it would have done so explicitly.

Shell attempts to discredit this argument by pointing out that the government improperly assumes that statutes are presumed to operate retroactively.

Of course, as above stated, statutes are usually presumed not to operate retroactively. But the whole scheme of CERCLA

was specifically designed to apply retroactively. If the presumption against retroactivity were sufficient to preclude recovery for pre-enactment response costs, it would also be sufficient to preclude recovery for pre-enactment damages to natural resources. Obviously that was not intended. If it were, the limiting provisions of sections 107(f) and 111(d) would be mere surplusage. In order to give meaning to these provisions, one must assume that liability for other damages—costs of removal or remedial action incurred by the United States or a State (§ 107(a)(4)(A)), and other necessary response costs incurred by any other person (§ 107(a)(4)(B))—is not so limited.

In *United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. at 842, the court placed great emphasis on the fact that "there is no clear and affirmative statement in the statute allowing for recovery of pre-enactment response costs." The court in *United States v. Wade,* 20 E.R.C. at 1851, was similarly troubled by the lack of an explicit statement. These courts interpreted the omission as evidence of Congress' intent not to allow recovery of such costs. While controversy undoubtedly would have been avoided had Congress explicitly provided for recovery of pre-enactment response costs, I conclude that Congress implicitly authorized retroactive application of sections 107(a)(4)(A) and (B) by affirmatively limiting retroactive application of the third category of liability, damages to natural resources, section 107(a)(4)(C). The court in *Wade* rejected this analysis on the ground that the limitation on recovery for natural resources damage is a limitation based on the *time* at which the damage *occurred,* not on the *time* at which funds are *spent* to repair the damage." 20 E.R.C. at 1850. With all due respect to Judge Newcomer, I believe he identified an important distinction but then drew the wrong conclusion. Recovery of *funds spent* for response actions under sections 107(a)(4)(A) and (B) is analytically equivalent, in the scheme of section 107(a), to recovery for *damage* to natural resources

under section 107(a)(4)(C). Section 107(f) provides that there may be no recovery for damage to natural resources occurring wholly before enactment. There is no similar limitation on funds spent for cleanup before enactment. Accordingly, one must conclude that funds so spent before enactment are recoverable.

■ There is good reason to preclude use of CERCLA monies and liability for cleanup of sites where both the release and the damages occurred wholly before enactment. The sites excluded under 107(f) and 111(d) are stable sites, that is, the environment, though damaged, will not deteriorate further. In a world with unlimited funds, such damaged resources could be reclaimed, but Congress apparently decided to utilize the limited resources of the fund created by CERCLA to clean up the thousands of sites, such as the Rocky Mountain Arsenal, which are not stable. CERCLA's goal is to clean up these sites before further damage occurs.

At the opposite end of the spectrum from the stable sites excluded under 107(f) and 111(d) are those sites, including the Arsenal, where the danger to the public health and welfare and to the environment was so imminent that the United States proceeded with cleanup without a special fund of money for that purpose and without assurance that it would be repaid by the persons responsible for the contamination. It was sites containing this magnitude of public danger that prompted Congress to enact CERCLA.

Construing section 107(a) to preclude recovery of pre-enactment response costs would carve out an exception to the general retroactive scheme of the statute for those most severe situations where, as here, the government's response commenced prior to enactment of the statute. I cannot believe that Congress could have intended to protect the public fisc by imposing liability on the responsible parties, yet except the sites where response had already commenced because the situations were the most imminently threatening. Such an interpretation

would penalize the government for prompt response and provide an undeserved windfall to the parties who had created, then abandoned, some of the most egregious sites. I decline to presume that Congress intended this irrational result.

Thus, I conclude from the statute's explicit limitation on recovery of certain natural resources damages, and its failure to limit retroactive recovery of response costs, that CERCLA authorizes recovery of response costs whether incurred before or after its enactment. I hold that Congress, in CERCLA, has overridden the presumption against retroactive application of statutes. The legislative history fully supports this conclusion.

### C. *Legislative History.*

In *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. at 1111, Judge Magnuson outlined CERCLA's legislative history:

> "The legislative history of the Act deserves some comment. Two different bills proceeded through the House and the Senate. The Senate made certain last minute amendments to its bill, (S.1480, 96th Cong., 2d Sess. 1980), most notably the removal of provisions imposing liability for personal injury caused by hazardous waste disposal. The House then struck the language in its bill, H.R. 7020, 96th Cong., 2d Sess. (1980), and substituted the language of the Senate bill. H.R. 7020, as amended, was eventually enacted. The bill retained the House file number, apparently because of a requirement that appropriations measures originate in the House. Due to the legislative history of the act, the Committee Reports must be read with some caution."

Shell interprets the legislative history as supporting its position. First, Shell points out that H.R. 7020, as introduced, authorized the recovery of pre-enactment response costs. Section 3072 of H.R. 7020, 96th Cong., 2d Sess. (1980) (as introduced) provided:

> "The provisions of this subpart and subpart C shall apply to releases of hazard-

ous waste without regard to whether or not such releases occurred before, or occur on or after, the date of the enactment of the Hazardous Waste Containment Act of 1980."

This retroactivity provision, however, was deleted from H.R. 7020. Shell argues that the fact it was stricken weighs heavily against retroactive construction of CERCLA.

I decline to draw from this deletion the conclusion Shell urges. Although the House did pass H.R. 7020, it did not become law. The version finally adopted by the House and enacted by Congress as a whole, amounted to a wholesale deletion of H.R. 7020 and substitution of S. 1480, the Senate bill. *See* 126 Cong.Rec. 31950 (1980). Thus it is not clear whether the House's intent regarding liability, whatever it was, was incorporated in the final version of the bill, or whether the House accepted the Senate's liability scheme in its entirety. Apart from this problem of interpretation, the provision Shell cites applied to liability for response costs without distinguishing between *costs* incurred before and after enactment; the provision addressed only the time when the *releases* occurred. CERCLA clearly imposes liability for post-enactment response costs for releases occurring before enactment. The deletion of § 3072 did not change this result. There is accordingly no reason to read the deletion as evidence of intent to preclude recovery of pre-CERCLA *response costs.*

The liability provisions of CERCLA were derived largely from the original Senate bill, S. 1480. S. 1480 contained a liability provision for both costs of removal (§ 4(a)(1)) and for natural resources, property and personal injury damages (§ 4(a)(2)). During discussions of S. 1480 in the Senate Committee on Environment and Public Works, concern was expressed about retroactive application of the bill. (Transcript of Senate Committee on Environment and Public Works Mark-up Session of S. 1480, June 26–27, 1980.) Senator Domenici introduced a new § 4(n) which

limited recovery for pre-enactment damages recoverable under § 4(a)(2). That section, in pertinent part, read as follows:

"(n)(1) No person (including the United States, the Fund, or any State) may recover under the authority of this section, nor may any money in the Fund be used under Section 6 of this Act for the payment of any claim, for damages specified under subsection (a)(2)(A), (B), (C), (D), (G), or (E) (other than for loss resulting from personal injury) of this section, nor may any money in the Fund be used under section 6(a)(1)(E) or (F) of this Act, where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act.[5]

\* \* \* \* \* \*

(4) For the purpose of this subsection, the costs of temporary or permanent relocation of residences and provision of alternative water supplies *shall be deemed costs of removal and not damage* specified in subsection (a)(2)(A) of this section." (Emphasis added.)

S. 1480 as reported out of the Senate Committee on Environment and Public Works (July 11, 1980).

Significantly, § 4(n)(1) did not apply to § 4(a)(1) which provided liability for response costs. The Senate report emphasized the limited scope of § 4(n):

"Section 4(n) specified how claims for certain damages occurring before the date of enactment will be handled under S. 1480. Costs of removal (cleanup and containment) *are not affected by this provision*, nor are any damages associated with continuing releases." (Emphasis added.)

Senate Report at 37.

In addition, commenting on the provision of § 4(n)(4) that "the costs of temporary or permanent relocation of residences ... shall be deemed costs of removal and not damages," Senator Domenici stated that the purpose of this provision was "that those kinds of damages become part of causes of action for *costs of removal and,*

---

**5.** The liability provision of S.1480, as introduced, § 4, provided:

"[T]he owner or operator of a vessel or an onshore or offshore facility from which a hazardous substance is discharged, released, or disposed of in violation of section 3(a) of this Act ... shall be jointly, severally, and strictly liable for—

(1)(A) all costs of removal, containment, or emergency response incurred by the United States Government or a State and

(B) any other costs or expenses incurred by any person to remove a hazardous substance as the terms "remove" or "removal" are defined in section 311(a)(8) of the Clean Water Act; and

(2) all damages for economic loss or loss due to personal injury or loss of natural resources resulting from such a discharge, release, or disposal, including—

(A) any injury to, destruction of, or loss of any real or personal property, including relocation costs;

(B) any loss of use of real or personal property;

(C) any injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss;

(D) any loss of use of any natural resources, without regard to the ownership or management of such resources;

(E) any loss of income or profits or impairment of earning capacity resulting from injury to or destruction of real or personal property or natural resources, without regard to the ownership of such property or resources;

(F) all out-of-pocket medical expenses, including rehabilitation costs, due to personal injury; and

(G) any direct or indirect loss of tax, royalty, rental, or net profits share revenue by the Federal Government or any State or political subdivision thereof, for a period of not to exceed one year."

Section 6(a)(1)(E) and (F) of S.1480, as introduced, provided:

"Sec. 6. (a)(1) The President shall use the money in the Fund for the following purposes:

\* \* \* \* \* \*

(E) the costs of assessing both short-term and long-term injury to, destruction of, or loss of any natural resources resulting from a discharge or release [of] a hazardous substance;

(F) the costs of Federal or State efforts in the restoration, rehabilitation, or replacement or acquiring the equivalent of any natural resources injured, destroyed, or lost as a result of any discharge or release of a hazardous substance; ...."

*therefore, are not affected by the retroactive limitations.*" (Transcript of Senate Committee on Environment and Public Works Mark-up Session of S. 1480, 194–95, June 26, 1980 (emphasis added).)

Shell asserts the fact that § 4(n) was deleted from the enacted compromise bill as indicating an intent not to authorize recovery for pre-enactment response costs. *See United States v. Northeastern Pharmaceutical and Chemical Co.*, 579 F.Supp. at 843. Shell is mistaken. The time limitations on damages added by § 4(n) of S. 1480 were maintained in the final version of CERCLA as the §§ 107(f) and 111(d) limitations on recovery of natural resources damages. The remaining time limitations of § 4(n) were deleted only because the substantive liability provisions for property and personal injury damages were deleted from the statute. Thus, the scheme of § 4(n) in limiting recovery for pre-enactment damages, but not response costs, was maintained in the final statute. The legislative history of § 4(n), including the comments emphasizing that recovery of removal costs is not to be limited by retroactivity concerns, therefore applies to the statute as passed.

Finally, Shell cites the following passage from the Senate Report, p. 62:

"Removal and remedial actions to protect public health, welfare and the environment *should begin* without delay and prior to full implementation of the programs, regulations, plans and procedures required by this Act. The many pressing problems which have led to enactment of legislation should not continue unabated pending such administrative actions. Therefore, actions necessary to protect public health, welfare or the environment *should begin* as soon as feasible. The non-regulatory authorities for response provided in this Act and other laws should be exercised prior to completion of any necessary planning, administrative and rulemaking responsibilities. However, once completed, such statutorily required planning, administration and final rulemaking shall govern subsequent government response actions."

(Emphasis added.)

Shell asserts that this passage suggests that actions taken prior to enactment were not "response actions" for which recovery can be sought. I draw no such inference. The Senate intended government response actions to begin as soon as possible, for example, before revision of the National Contingency Plan, because the hazardous waste problem was serious and the solution already was long overdue. In a few cases, such as at the Arsenal, the problem was so severe that the government responded without benefit of a "Superfund" or improved liability provisions to aid in recouping costs from polluters. It makes little sense to construe a statement that merely acknowledges the gravity of the problem as prohibiting application of the Act's liability provisions to the gravest cases. Additionally, this very broad, general statement of a policy to expedite cleanup cannot be construed fairly as having any bearing on the specific question whether CERCLA authorizes recovery for pre-enactment response costs.

In sum, I conclude that the whole purpose and scheme of CERCLA is retrospective and remedial. Where Congress has intended a liability provision to have only prospective operation, as in the case of natural resources damages, Congress has so stated explicitly. (Sections 107(f) and 111(d), 42 U.S.C. §§ 9607(f) and 9611(d).) Congress did not explicitly limit or deny liability for response costs incurred before enactment. Consistent with the statutory scheme, I conclude that CERCLA authorizes recovery of pre-enactment response costs.

Shell's motion for partial dismissal of the first claim for relief, therefore, is denied.

IV. *Motion of Shell Oil Company to Join the United States Department of the Army as a Defendant and Motion to Join the State of Colorado as Plaintiff.*

Shell has moved under Rule 19(a), Fed.R. Civ.P., to join the State of Colorado as a

plaintiff and to join the Army as a defendant in this action. Colorado and the Army oppose joinder. Rather, they have moved to consolidate this action with the related case filed by Colorado against Shell and the Army for damages for injury to natural resources at the Arsenal, No. 83–C–2386 (D.Colo. filed Dec. 9, 1983).

The Army has admitted its liability under CERCLA § 107(a) for contamination at the Arsenal. In its October 3, 1983 claim letter served on Shell pursuant to CERCLA § 112(a), 42 U.S.C. § 9612(a), the Army stated:

"Shell's activities in manufacturing pesticides and other materials and arranging for their disposal and disposing of them at Rocky Mountain Arsenal and Shell's operation of a facility at which hazardous substances were disposed renders it liable for response, removal and remedial costs and damages to natural resources arising from such activities. The Department of the Army recognizes its responsibility under CERCLA for conditions which have resulted from its disposal of materials at the site and desires to discuss with Shell an appropriate apportionment of responsibility for those conditions. The Department of the Army does not demand hereby that Shell be responsible for any costs incurred at the site or any damages to natural resources there which are solely the responsibility of the Army."

Although Shell's liability for contamination at the Arsenal has not yet been determined, there can be little doubt that Shell is a "responsible party" under section 107. A central issue in this case is thus the apportionment of liability between Shell and the Army for cleanup at the Arsenal.

The United States, on behalf of the Army, requests reimbursement from Shell of costs incurred by the Army in responding to hazardous substance releases caused by Shell at the Arsenal. *See* CERCLA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A). The United States and Colorado, in their respective suits, have sued for damages for injury to natural resources at the Arsenal under CERCLA § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C). It appears that the Army and Colorado are co-trustees for the natural resources at the Arsenal. CERCLA § 107(f), 42 U.S.C. § 9607(f), provides that "[t]he President, or the authorized representative of any State, shall act on behalf of the public as trustee of such natural resources to recover for such damages." The President, pursuant to CERCLA § 115, 42 U.S.C. § 9615, designated the Secretary of Defense as the federal trustee for those natural resources in, over, or under Department of Defense installations,[6] and the Secretary of Defense further delegated this authority to the Secretary of the Army for installations operated by the Department of the Army.[7] It appears, therefore, that damages recovered from Shell and the Army, will ultimately be apportioned between the Army and Colorado.

Through its motions to join, Shell seeks to align all the parties involved in the two Arsenal suits in one action. Rule 19, Fed. R.Civ.P., governs the joinder of persons needed for just adjudication. Rule 19(a) provides:

"(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be

---

**6.** Executive Order 12316, §§ 1(d), 2(c), 2(d), 46 Fed.Reg. 42237 (1981).

**7.** November 2, 1981 delegation memorandum of Secretary of Defense.

made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action."

### A. *Joinder of Colorado as Plaintiff.*

As a trustee for natural resources at the Arsenal, Colorado claims an interest relating to the subject matter of this action. Shell asserts that disposition of this action in Colorado's absence may impair or impede the State's ability to protect its interest because the United States may recover damages for injury to natural resources claimed by Colorado. Colorado apparently does not share this concern; it objects to its joinder as a party plaintiff.

Shell also argues that, if Colorado is not joined, Shell may be subject to a substantial risk of incurring multiple or inconsistent obligations to the United States and Colorado because, as co-trustees, each may be awarded damages from Shell for injury to natural resources. Shell asserts that joinder is mandatory when the requirements of Rule 19(a) are met.

At the hearing on this motion, I expressed concern that if Colorado were now joined as a plaintiff, it would be barred by CERCLA's statute of limitations from asserting its claim against Shell and the Army in this action.[8] CERCLA § 112(d), 42 U.S.C. § 9612(d) provides:

"No claim may be presented, nor may an action be commenced for damages under this title unless that claim is presented or action commenced within three years from the date of the discovery of the loss or the date of enactment of this Act [enacted Dec. 11, 1980], whichever is later. . . ."

It appears that the statute of limitations bars the assertion of claims for natural resources damages after December 11,

1983. At the hearing I inquired of counsel for Shell whether Shell would waive the statute of limitations defense. Counsel refused to do so.

I cannot believe that Rule 19(a) requires joinder when joinder will deprive the party joined of its claim for relief. All the Federal Rules of Civil Procedure must be read in the light of the direction in Rule 1 that the Rules "shall be construed to secure the just, speedy, and inexpensive determination of every action." Construing Rule 19(a) to require joinder of Colorado would not secure a just determination of this controversy; it would result in a harsh miscarriage of justice by depriving Colorado of its claim.

Furthermore, there is not a "substantial risk" that Shell will be subjected to multiple or inconsistent obligations if the two Arsenal actions are consolidated before me. Discovery and trial on both liability and damages in the consolidated cases will proceed as one. When the total amount of Shell's liability for injury to natural resources is determined, that amount will be apportioned between the Army and Colorado. Therefore, Shell's motion for joinder of Colorado as a plaintiff is denied.

### B. *Joinder of the Army as Defendant.*

Shell has moved to join the Army as a defendant, asserting that both it and the public will be prejudiced if the motion is not granted. First, Shell argues that if it is the sole defendant, the United States will attempt to saddle it with liability that rightfully should be borne by the Army. Second, Shell argues that if the Army is not joined, the Army may not pay for its share of the cleanup, thereby creating the risk of a partial or incomplete recovery in conflict with the public's interest in a complete cleanup at the Arsenal. In essence, Shell seeks to reposition the parties to place the United States, as plaintiff, in the posture of suing the Army and Shell, as defendants.

---

**8.** It would only make sense to join Colorado as a plaintiff in this action if, after joinder, its action, No. 83–C–2386, were dismissed.

Before addressing the specific concerns raised by Shell, I must determine whether under the circumstances presented the United States, as plaintiff, can sue its own Department of the Army, an arm of its Executive Branch. The United States argues that it and the Department of the Army are one and the same entity as a matter of law. Shell argues in opposition that CERCLA makes the Army a juridically distinct entity. Section 107(g), 42 U.S.C. § 9607(g), provides:

> "Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government shall be subject to, and comply with, this Act in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under this section."

Shell argues that a case or controversy can exist between the United States and its officers or agencies, relying on *United States v. Nixon*, 418 U.S. 683, 692–97, 94 S.Ct. 3090, 3099–3102, 41 L.Ed.2d 1039 (1974); *United States v. Interstate Commerce Commission*, 337 U.S. 426, 430–31, 69 S.Ct. 1410, 1413–14, 93 L.Ed. 1451 (1949); *United States v. Federal Maritime Commission*, 694 F.2d 793, 809–10 (D.C. Cir.1982); *United States v. Federal Maritime Commission*, 655 F.2d 247, 252 (D.C. Cir.1980).

In *United States v. Nixon*, 418 U.S. at 693, 94 S.Ct. at 3100, the Supreme Court observed:

> "The mere assertion of a claim of an 'intra-branch dispute,' without more, has never operated to defeat federal jurisdiction; justiciability does not depend on such a surface inquiry. In *United States v. ICC*, 337 U.S. 426 [69 S.Ct. 1410, 93 L.Ed. 1451 (1949), the Court observed, 'courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.' *Id.*, at 430 [69 S.Ct. at 1413]."

When I look behind the "United States," the denominated plaintiff in this case, I find the Department of the Army. It is the Army that claims to have spent approximately $48,000,000 in responding to releases of hazardous chemicals at the Arsenal. It is the Army that continues to plan, in consultation with the Environmental Protection Agency, a comprehensive solution to the Arsenal contamination problem. It is the Army that is the designated trustee for natural resources at the Arsenal. If the Army were joined as a defendant, the Army would in actuality, as well as in name, be suing itself.

The cases cited by Shell present the questions: Is the dispute of a type that is traditionally justiciable? Does the setting of the dispute assure "concrete adverseness" of the parties? *United States v. Nixon*, 418 U.S. at 697, 94 S.Ct. at 3102; *United States v. Interstate Commerce Commission*, 337 U.S. at 430, 69 S.Ct. at 1413; *United States v. Federal Maritime Commission*, 694 F.2d at 810.

In *United States v. Interstate Commerce Commission*, the United States, as shipper, filed with the Interstate Commerce Commission a complaint against railroads claiming that they had exacted from the United States rates that were unreasonable, unjustly discriminatory, and violative of the Interstate Commerce Act. When the Commission denied reparations and ordered the complaint dismissed, the United States sued in the district court to set aside the Commission order. A three-judge district court dismissed the case on the theory that the government could not sue itself. The Supreme Court reversed, finding that even though the case was denominated *United States v. United States*, the basic controversy was whether railroads had illegally exacted money from the United States. The United States, as shipper, was actually aggrieved by an independent regulatory agency's decision. The Supreme Court found the controversy to be of a type "traditionally justiciable." 337 U.S. at 430, 69 S.Ct. at 1413.

Similarly, in *United States v. Federal Maritime Commission*, 694 F.2d 793, the Antitrust Division of the Department of

Justice brought suit to challenge the Commission's approval of certain pooling agreements between shippers. While the Antitrust Division believed, and had argued before the Commission, that the agreements violated the antitrust laws, the Commission approved the agreements and thereby exempted the shippers from the requirements of the antitrust laws. In response to the argument that the Article III "case or controversy" prerequisite to federal jurisdiction was not met because the "United States is suing itself," the court stated:

> "We believe, however, that the structure of the government of the United States permits cases and controversies to arise between separate agencies.... This dispute over the validity of a Commission order raises issues that courts traditionally resolve and the setting assures the concrete adverseness on which sharpened presentation of the issues is thought to depend. The parties' controversy is justiciable." 694 F.2d at 809, 810."

■ Here, however, there is no interagency dispute presented. The apparent paradox presented by the Army being both a responsible party and a plaintiff in this action arises because the Army *in the past* committed acts which contaminated the Arsenal but has since recognized the harm it caused and is *presently* taking action to remedy the problem. A "dispute" between the "new" Army and the "old" Army cannot be adjudicated. There is only one Army before this court. The Army is the plaintiff and the designated trustee for natural resources at the Arsenal. As such, it cannot sue itself, even though it may be a liable and responsible party under CERCLA §§ 107(a) and 107(g), 42 U.S.C. §§ 9607(a) and 9607(g).

The case is not unlike a common comparative negligence case where a defendant asserts that the injured plaintiff's conduct caused some or all of his own injury. Procedurally, the plaintiff is not joined as a defendant; rather the court apportions responsibility for the damages.

■ It must be determined whether the Army is a "person to be joined if feasible," as described in rule 19(a)(1)–(2), and if so, given that it cannot be joined, whether the Army is an indispensable party under Rule 19(b). Both of these questions must be answered in the negative. First, the Army is not "absent" from this action—it is the plaintiff. Second, the dangers of prejudice raised by Shell, and equitable concerns underlying Rule 19, are adequately addressed by the Army's presence in this case as plaintiff and by consolidation of this case with the similar action brought by the State of Colorado.

■ The Army stands before this court not just as a proponent for its own interests, but also as trustee for the natural resources at the Arsenal. As such, it has a fiduciary obligation to the citizens of this country to ensure that the Arsenal cleanup is complete. As trustee, the Army is bound to accept responsibility for its share of the costs of cleanup and damages for injury to the natural resources.

■ Additionally, Shell and the Army are co-defendants in the suit brought by Colorado. Colorado, as co-trustee, can ensure that the public interest is protected and that Shell and the Army each pay its proportionate share of the liability. *See* III Scott on Trusts § 200.2 (3rd ed. 1967) (co-trustee can maintain a suit against the other to compel him to perform his duties under the trust or to enjoin him from committing a breach of trust). Finally, it may be that by cross-claim in that suit, or by counterclaim in this suit, Shell can ensure that the Army pays its rightful share; those issues are not presently before me.[9]

---

**9.** The United States argues that one responsible party cannot compel the joinder of another under Rule 19. The United States relies upon *New York v. Shore Realty Corp.,* 21 E.R.C. 1430 (E.D. N.Y.1984); *United States v. A & F Materials Co.,* 578 F.Supp. 1249; *United States v. Northeastern Pharmaceutical and Chemical Company,* 579 F.Supp. 823; and *United States v. Conservation Chemical Co.,* 589 F.Supp. 59 (W.D.Mo.1984). I agree.

Although CERCLA permits the imposition of joint and several liability, the Act does not mandate joint and several liability. Courts have determined whether to impose joint and several

Though Shell has avoided placing the issue squarely before this court, it appears that Shell seeks joinder of the Army as a means to disqualify the Army from acting as plaintiff. Shell, in essence, argues that § 107(g) prohibits the President from delegating his trustee obligations to a federal agency which is a responsible party under § 107(a). Shell stated at oral argument that if the Army is joined as a defendant, the government would have to "adjust" by replacing the Army as trustee. This would be no minor adjustment. The Army has been directing cleanup activities at the Arsenal since 1975. Army personnel are currently working to develop a comprehensive cleanup plan, a plan which may require implementation over many years and cost hundreds of millions of dollars. What other agency could now assume responsibility for this massive undertaking? Would a new trustee step in to complete the planning commenced by the Army and work with the team of technicians already assembled, or would the new trustee be required to start anew, undoubtedly further delaying the cleanup? These questions, and many other pertinent questions, have not been addressed because the issue of the propriety of the Army acting as trustee has not been fairly presented to this court in a direct, adversary confrontation.

It is not at all clear to me that § 107(g) prohibits a responsible federal party from ever serving as trustee. Conceivably, a responsible federal party may best discharge its liability under CERCLA by assuming its trusteeship obligations in good faith and commencing cleanup action without waiting to be sued by another agency of the government. This important issue is not one to be decided in the guise of a motion to join after only cursory and oblique comments by the parties.

As the case now stands, joining the Army as a defendant would result in the Army suing itself. Under Article III the claim is not justiciable. Shell's motion for joinder of the Army, therefore, is denied.

V. *Motion for Reconsideration of My Denial of Shell's Motion to Strike Allegations of Claimed Damage Amounts.*

Shell moved under Rule 12(f), Fed.R. Civ.P., to strike all allegations in the complaint pertaining to the sum of $1.8 billion. Rule 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The United States has alleged that the cost of decontaminating the natural resources at the Arsenal, and the amount of damages to the natural resources at the Arsenal, is approximately $1.8 billion.[10] (Complaint

---

liability "under common law principles on a case-by-case basis." *New York v. Shore Realty Corp.,* 21 E.R.C. at 1432. It does not appear that the United States seeks the imposition of joint and several liability against Shell; the United States has represented to Shell and to this court that it only seeks payment from Shell for Shell's proportionate share of the cleanup.

In *New York v. Shore Realty Corp.,* the court denied the defendant's motion to compel the joinder of other responsible parties under Rule 19. The court concluded, at 1432:

"[I]t may well be that joint and several liability will be imposed on the present defendants, although the Court declines at this early stage of the litigation to determine what standards of liability should be imposed. However, even in the absence of joint and several liability, defendants run no risk of multiple liability, since the Court can determine, based on common law principles, *e.g.* Restatement (Second) of Torts §§ [433A], 881 (1976); *United States v. Chem-Dyne, supra* at 1958, the

extent to which defendants will be responsible for the cleanup."

Similarly, I find that non-joinder will not subject Shell to any risk of increased or multiple liability because I will, as the case is now postured, ultimately apportion liability between the United States and Shell.

The United States also argues that it has prosecutorial discretion in choosing whom to sue among possible responsible parties. Consequently, it asserts that its decision not to sue the Army cannot be challenged. While the principle of prosecutorial discretion would in general preclude such a challenge, the principle cannot be invoked when the prosecutor is choosing not to sue itself or its agent.

10. Shell argues that the cost of decontamination should not be related to the assessment of natural resources damages. While CERCLA provides separate claims for recovery of costs incurred for "remedial action," § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), and for damage to natu-

paras. 36, 59.) This figure is based on a draft engineering study conducted by the Rocky Mountain Arsenal and the United States Army Toxic and Hazardous Materials Agency. The report outlines four cleanup options for the Arsenal costing from $210 million to $1.8 billion. The $1.8 billion allegation in the complaint corresponds to the "worst case" scenario, the most expensive cleanup option.

At the hearing on September 14, 1984, I denied Shell's motion to strike. The Army announced on October 23, 1984 a proposal for remedial action at the Arsenal. The current estimated cost of the plan is approximately $350 million. On October 26, 1984, I granted Shell leave to renew its motion to strike on the basis of the Army's recent proposal for remedial action.

 I have considered the briefs filed in connection with the original motion to strike, Shell's memorandum concerning reconsideration of my denial of its motion to strike, and the United States' response to that memorandum. I conclude that the renewed motion to strike must be denied.

The proposal made by the Army is at present tentative and conceptual in nature. Further studies and planning must be conducted before a final decision is made and the plan implemented. Apparently, the Army is seeking a solution in cooperation with the State of Colorado. Colorado has not yet commented on or approved the proposal. Moreover, comments on the plan have not yet been received from Shell or from the public. The Army will review these comments before making a final decision.

 Motions to strike under Rule 12(f) are not favored. *See* 5 Wright & Miller, Federal Practice and Procedure § 1380, at 783 (1969). As the allegation of claimed damages is not "scandalous" or "reduntant," Shell must demonstrate that the figure is "immaterial" or "impertinent." "In deciding whether to [grant] a

Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir.1976). Only allegations "so unrelated to plaintiff's claims as to be unworthy of any consideration" should be stricken. *EEOC v. Ford Motor Co.*, 529 F.Supp. 643, 644 (D.Colo. 1982). As stated above, the $1.8 billion figure is allegedly based on an engineering study outlining cleanup options for the Arsenal. As such, it is clearly not unrelated to the United States' claims.

Shell has cited a number of cases in which courts have stricken allegations of claimed damage amounts from the complaint pursuant to Rule 12(f). These cases, however, do not support Shell's motion in the instant case. In most of the cases cited by Shell, the courts have stricken the allegations in question because of concern that a jury would be prejudiced by inflated or baseless figures. *Williams v. Nichols*, 266 F.2d 389 (4th Cir.1959); *Ryer v. Harrisburg Kohl Brothers, Inc.*, 53 F.R.D. 404 (M.D.Pa.1971); *Ayoub v. Helm's Express, Inc.*, 300 F.Supp. 473 (W.D.Pa.1969); *A v. B*, 46 F.R.D. 456 (W.D.Pa.1969); *Craven v. Associated Transport, Inc.*, 40 F.R.D. 8 (D.S.C.1966); *Mitchell v. American Tobacco Co.*, 28 F.R.D. 315 (M.D.Pa.1961). This case will be tried to the court, not to a jury; there is no danger of jury prejudice here.

In two other cases, the court's concern was not so much with the *amount* set out in the prayer for damages, but that the facts may not have justified damages of the kind sought at all. *Strick Corp. v. Penn Yan Express, Inc.*, 62 F.R.D. 4 (E.D. Pa.1974) ("specification of a sum certain [for punitive damages] is inappropriate before any facts are developed which would justify submitting the question of punitive damages to the jury"); *Robinson v. Lull*,

---

ral resources, § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C), it can be expected that there is a great deal of overlap between the two. The appropriate measure of natural resources dam-

age in light of the remedial plan ultimately adopted will be a complex legal and factual question of first impression that is inappropriate for resolution on a motion to strike.

145 F.Supp. 134 (N.D.Ill.1956) (where doctor sued the American Medical Association for allegedly improper expulsion, court struck plaintiff's claim for damages allegedly resulting from plaintiff's father's changing his will because "any such damage would be uncertain, remote and speculative consequences of the tort for which the defendant is not legally responsible"). Here, there is little doubt that the United States has properly stated a claim for damage to natural resources; Shell is only attacking the amount claimed and set out in the prayer.

 While it might have been more accurate for the United States to have pleaded an estimated amount of damages to natural resources of between $210 million and $1.8 billion, I conclude that the government's pleading of the highest estimated cost of cleanup does not subject the allegation to being stricken under Rule 12(f). The allegation is not "redundant, immaterial, impertinent or scandalous."

Finally, it appears, and I find and conclude, that more efficient management of this action and of No. 83-C-2386 can be accomplished if the two cases are consolidated, at least for all pre-trial matters.

Accordingly,

IT IS ORDERED that Shell's motion for partial dismissal of the first claim for relief is denied.

IT IS FURTHER ORDERED that Shell's motion to join the Army as a defendant is denied.

IT IS FURTHER ORDERED that Shell's motion to join the State of Colorado as a plaintiff is denied.

IT IS FURTHER ORDERED that Shell's renewed motion to strike is denied.

IT IS FURTHER ORDERED that this action shall be consolidated with Civil Action No. 83-C-2386, *State of Colorado v. the United States Army and Shell Oil Company,* for all purposes until further order of the court.