# Constitutionality of Nuclear Regulatory Commission's Imposition of Civil Penalties on the Air Force

In the absence of Presidential intervention to review its decision, the Nuclear Regulatory Commission may constitutionally issue an order imposing civil penalties on the Department of the Air Force under the Atomic Energy Act of 1954.

Although Congress may not deprive the President of an opportunity to review a decision made by an agency subject to his supervisory authority, the President is not constitutionally required to review all such decisions before they may be lawfully implemented.

Because the Atomic Energy Act gives the Attorney General exclusive authority and discretion to enforce civil penalties imposed under the Act, an interagency dispute regarding the collection of such penalties would properly be resolved within the executive branch rather than through interagency litigation.

June 8, 1989

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE AIR FORCE

This memorandum responds to your request for an opinion of this Office on the constitutionality of the United States Nuclear Regulatory Commission's ("NRC") imposition of civil penalties on the Department of the Air Force under the Atomic Energy Act of 1954, as amended ("Act"), 42 U.S.C. §§ 2011-2296. In particular, you have asked whether the Constitution permits the NRC: 1) to issue an order imposing civil penalties against the Air Force without a prior opportunity for the Air Force to contest the fine within the executive branch; or 2) to collect civil penalties against the Air Force by litigation in court.

We believe, as a general matter, that the President has authority to review and revise decisions of his subordinates in the executive branch. Although the President cannot be deprived of the opportunity to review a decision subject to his supervisory authority, this does not mean that the President is constitutionally compelled to review every decision before it is implemented. After reviewing the questions you have posed, we conclude that, because the President has expressed no interest in reviewing either personally or through a delegate the NRC's issuance of orders, we need not reach whether, and to what extent, the President's supervisory authority extends to orders issued by the NRC.[1] On the other hand, we agree with you that there would be significant constitutional

problems had Congress directed the NRC to collect the penalties it orders by suing the Air Force in federal court. The Act, however, permits the Attorney General to determine whether, and to what extent, civil penalties should be collected. Thus, any issue regarding your liability for civil penalties may be resolved by an executive branch agency and without resort to interagency litigation.

## I. Background

The Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2296, as amended by the Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801-5851, established the Nuclear Regulatory Commission ("NRC"). The agency is charged with broad licensing and regulatory authority over the development and utilization of atomic energy, the construction and maintenance of facilities, and the uses and storage of nuclear material. 42 U.S.C. §§ 2061-2064 (ownership and acquisition of production facilities); 42 U.S.C. §§ 2071-2078, 2091-2099, and 2111-2114 (regulation of nuclear materials and byproducts); 42 U.S.C. §§ 2131-2140 (licensing); 42 U.S.C. §§ 2201-2213 (general powers and duties). The Act provides that Commissioners are appointed by the President, with the advice and consent of the Senate, and "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." 42 U.S.C. § 5841(a), (e).

The Act invests the NRC with broad authority to regulate uses of nuclear power, with certain exceptions for military purposes expressly provided for in the Act.[2] Specifically, the NRC has the authority to license nuclear facilities and material, *id.* §§ 2133, 2073, including those of government agencies, *id.* § 2014(s); to issue rules and regulations, *id.* § 2201; and to inspect and investigate alleged violations of its rules, *id.*

In 1969, Congress passed amendments to the Atomic Energy Act authorizing the NRC to levy civil monetary penalties for violations of its regulations. The addition of monetary penalties was intended to give the NRC additional flexibility to deal with infractions of regulations that did not require the harsher sanctions of revocation or suspension of a license or

---

[1] The Air Force does not argue that all actions by the NRC are unconstitutional because of the NRC's status as an agency with some statutory independence We thus do not address the constitutional status of the NRC or the constitutionality of its actions generally.

[2] The President is authorized by the Act to require the Commission to deliver nuclear material and to authorize its use for military purposes:

> The President from time to time may direct the Commission (1) to deliver such quantities of special nuclear material or atomic weapons to the Department of Defense for such use as he deems necessary in the interest of national defense, or (2) to authorize the Department of Defense to manufacture, produce, or acquire any atomic weapon or utilization facility for military purposes: *Provided, however,* That such authorization shall not extend to the production of special nuclear material other than that incidental to the operation of such utilization facilities

42 U S C. § 2121(b). A license is not required for any actions authorized under section 2121. *See* 42 U.S C. § 2140(b).

a cease and desist order. *See* S. Rep. No. 553, 91st Cong., 1st Sess. 9-12 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1607, 1615-19.[3]

Section 2282(a) provides:

> Any person who (1) violates any licensing provision ... or any rule, regulation, or order issued thereunder, or any term, condition, or limitation of any license issued thereunder, or (2) commits any violation for which a license may be revoked under section 2236 of this title, shall be subject to a civil penalty, to be imposed by the Commission, of not to exceed $100,000 for each such violation. If any violation is a continuing one, each day of such violation shall constitute a separate violation for the purpose of computing the applicable civil penalty. The Commission shall have the power to compromise, mitigate or remit such penalties.

42 U.S.C. § 2282(a). The term "person" is defined specifically to include government agencies:

> The term "person" means (1) any individual, corporation, partnership, firm, association, trust, estate, public or private institution, group, Government agency other than the Commission ....

42 U.S.C. § 2014(s). "Government Agency" includes any executive department of the United States. 42 U.S.C. § 2014(l).

Whenever the Commission has reason to believe that a violation subject to a civil penalty has occurred, the Commission is required to notify the person, identify the alleged violation, advise the person of the proposed penalty, and provide an opportunity to demonstrate why the penalty should not be imposed. 42 U.S.C. § 2282(b). The Commission has formally adopted procedures for the imposition of civil penalties. *See* 10 C.F.R. § 2.205; 10 C.F.R. pt. 2, app. C. (1988). Under these provisions, the person charged with a civil penalty will receive a written notice of violation specifying the date and nature of the alleged violation, the particular provision, rule, or regulation allegedly violated, and the amount of the proposed penalty. 10 C.F.R. § 2.2.01(a). Payment of the penalty or a written answer either denying the violation or showing extenuating circumstances is required within twenty days. *Id.* § 2.201(a), (b). The NRC may, at this time, issue an order dismissing, mitigating or imposing a civil penalty. The person charged may then request a hearing at which the

---

[3] In 1980, the maximum penalty for each violation was raised from $5000 to $100,000 to provide the NRC with escalated enforcement sanctions and a greater prospect of deterrence Pub L No. 96-295, 94 Stat. 780, 787 (1980).

merits of the alleged violation and the applicability of the rules and regulations can be contested. *Id.* § 2.205(c), (d). After the hearing, the Commission will issue an order dismissing, mitigating, or imposing the civil penalty. *Id.* § 2.205(f).[4]

The Commission, however, does not itself have authority directly to collect the amount of the penalty assessed if the violator fails to pay the fine upon issuance of a final order. Instead, the Act permits the NRC to refer the matter to the Attorney General for collection. Section 2282(c) provides:

> On the request of the Commission, the Attorney General is authorized to institute a civil action to collect a penalty imposed pursuant to this section. The Attorney General shall have the exclusive power to compromise, mitigate, or remit such civil penalties as are referred to him for collection.

42 U.S.C. § 2282(c). The Senate Report accompanying the civil penalty provisions makes clear that the Attorney General is authorized, but not required, to institute a civil action to collect the penalty:

> While the bill would confer on the Commission the power of compromise, mitigation, and remission of penalties, such power would reside exclusively with the Attorney General under the bill with respect to such civil penalties as are referred by the AEC to him for collection.

S. Rep. No. 553, 91st Cong., 1st Sess. 11 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1607, 1618. In 1980, the NRC requested authority to collect civil penalties directly, but Congress refused to change the law.[5]

---

[4] The NRC assesses civil penalties based in part on the severity of the violation. *See* 10 C.F.R § 2 205 and 10 C.F.R pt. 2, app C (1988). Violations for which civil penalties can be imposed are broken down into five severity levels, and in determining the amount of the violation, the Commission will take into account such factors as whether the violation was identified by the licensee, whether it was reported by the licensee, the corrective action taken, and whether the violation or similar violations have been recurring. *See* 10 C.F.R. pt. 2, app C.

[5] *See* S Rep. No. 176, 96th Cong, 1st Sess. 24 (1980), *reprinted in* 1980 U.S.C C.A N. 2216, 2239

The Commission also requested that it be given the authority to administratively impose and collect penalties without the opportunity for de novo trial before a Federal District Court. According to the Commission, the present system of imposing and collecting a civil penalty through action of the Attorney General in Federal district court denies the Commission full control of its enforcement action, and raises the possibility that the Attorney General will settle the action for a lower penalty than that sought by NRC. The Commission recognizes, however, that the present enforcement approach, including the opportunity for de novo trial, is typical for Federal agencies Further, the Commission has failed to identify any instances in which the present approach has resulted in a significant weakening of the enforcement action proposed by NRC

The committee believes that there is considerable value in retaining the existing approach ....
Accordingly, the committee recommends that the present statutory mechanism for imposing and correcting civil penalties be retained

Under its section 2282 authority to impose civil penalties, the NRC sent the Air Force a Notice of Violation and Proposed Imposition of Civil Penalties of $102,500 on June 17, 1988. The alleged violation arose from the accidental spill in 1986 of radioactive materials from a barrel stored on Wright-Patterson Air Force Base, Ohio. The penalty was proposed because of the alleged failure of the Air Force personnel to adequately report the spill to the NRC.

The Air Force replied to the alleged violation with a written response on July 15, 1988. Air Force officials had an extended meeting with the NRC at which they contested the underlying factual basis for the charges. The principal factual disagreement is whether and to what extent certain Air Force personnel were involved in a deliberate or willful failure to report the spill. The Air Force has not participated in internal administrative hearings before the NRC, but has instead raised constitutional defenses, asserting both that the NRC cannot constitutionally issue a final order assessing a penalty without prior review by the President and that in any event the penalty cannot be enforced by the Attorney General through litigation. The NRC has agreed to hold its final order in abeyance pending our resolution of these issues.

## II. Imposition of Civil Penalties Against Federal Agencies

The Air Force contends that the Constitution does not permit the NRC unilaterally to impose civil penalties against a member of the executive branch because both the NRC and the Air Force are "part of one of the three fundamental Branches of the Government under our Constitution." Letter for Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, from Ann N. Foreman, General Counsel, Department of the Air Force at 3 (Mar. 17, 1989) ("Foreman Letter"). Underlying this contention is the Air Force's view that "[t]he President is the final arbiter of a singular executive branch policy and of how any dispute between agencies will be resolved." *Id.* The Air Force concludes from this premise that the NRC cannot constitutionally issue a final order against the Air Force until the President resolves any differences between the two agencies.

Although we agree as a general matter with the premise underlying the Air Force's argument — namely that the President must have an opportunity to review disputes between members of the executive branch — we disagree with its conclusion that the President is affirmatively compelled to resolve this dispute between the NRC and itself. In our view, the President may permit the NRC to carry out a decision taken pursuant to its statutory duties despite the objection of another agency.

The President's authority to review and revise the decisions of his subordinates derives from his authority under Article II of the Constitution, which states that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl.

1. Moreover, the President has the constitutional responsibility to "take Care that the Laws be faithfully executed." *Id.* § 3. It is well-established that these provisions generally authorize the President to supervise and guide executive officers in the administration of their statutory duties. *See Myers v. United States*, 272 U.S. 52, 135 (1926) (The President has the authority to "supervise and guide" executive officers in "their construction of the statutes under which they act in order to secure that unitary and uniform execution of the laws which Article II of the Constitution evidently contemplated in vesting general executive power in the President alone.").

Although the President *may* take the opportunity to review decisions pursuant to his Article II authority, Article II does not mandate that he undertake such review. Thus, the President's subordinates may make decisions pursuant to the statutory duties that Congress has entrusted to their respective offices even in the absence of the President's actual review of those decisions so long as the President is not precluded from the opportunity to review these decisions. This understanding of the President's supervisory authority comports with the practical reality of decisionmaking within the executive branch: day-to-day decisions are often made by the President's subordinates although the President does not review these decisions.

The President's authority to review disputes between his subordinates is simply an aspect of his general supervisory authority over the executive branch. For instance, when two of his subordinates dispute the meaning of a statute, the President may decide to review the matter. The Constitution, however, does not mandate that he resolve disputes either personally or through his subordinates.[6] If it is the President's choice not to review the dispute, then the agencies may act in accordance with their respective statutory authorities. Thus, it is not inconsistent with the Constitution for an executive agency to impose a penalty on another

---

[6] The Air Force quotes testimony from former Assistant Attorney General for Land and Natural Resources F. Henry Habicht II that "Executive Branch agencies may not sue one another, nor may one agency be ordered by another to comply with an administrative order *without the prior opportunity to contest the order within the Executive Branch.*" *Environmental Compliance by Federal Agencies Hearings Before the Subcomm on Oversight and Investigations of the House Comm. on Energy and Commerce*, 100th Cong., 1st Sess. 210 (1987) (statement of F Henry Habicht). We believe, however, that Mr Habicht's testimony is consistent with our view that, while the President must have the opportunity to review decisions subject to his supervisory authority, the Constitution does not compel him to review such decisions. The Air Force cannot contend that it has had no opportunity to contest the NRC's order within the executive branch It could have brought this dispute to the attention of the President at any time after it received notice from the NRC on June 17, 1988. Moreover, Mr. Habicht's testimony occurred in the context of an oversight hearing relating to the Resource Conservation and Recovery Act ("RCRA"), a statute that permits the EPA directly to impose civil penalties on other agencies. 42 U.S.C. §§ 6927(c), 6928(c). The President has specified an internal dispute resolution mechanism for agency disagreements with the EPA *See* Exec Order No. 12088, 3 C F R. 243 (1978) (authorizing the Director of the Office of Management and Budget to consider unresolved conflicts between agencies at the request of the EPA Administrator).

executive agency pursuant to its statutory authority so long as the President is not deprived of his opportunity to review the matter.[7]

A number of Executive Orders illustrate that the President does establish formal dispute resolution mechanisms for executive branch disagreements when he deems them necessary. For certain executive branch disputes, for example, the President has directly asserted his authority by ordering such agencies to submit the dispute to the Attorney General.[8] The President has also directed that agencies in conflict with the Equal Employment Opportunity Commission on a question of employment standards refer their dispute to the Executive Office of the President.[9] Finally, in a context similar to this one, the President has issued an Executive Order requiring that certain disputes relating to pollution controls enforceable by the EPA shall be resolved by the Director of OMB.[10] This last order requires the Administrator of EPA to "make every effort to resolve conflicts regarding" agency violations, and provides that the Director of OMB shall adjudicate if the Administrator is unsuccessful. Exec. Order No. 12088, § 1-602, 3 C.F.R. 244 (1978). The Order is significant both in its anticipation that the EPA may enforce environmental laws against other federal agencies and in its prescribing a method of resolving interagency disputes should they arise.

The President, however, has issued no such order concerning the NRC's issuance of civil penalties against other agencies. Nor has the

---

[7] The Air Force also contends that the Office of Management and Budget "expressed the Administration's view" that several proposed bills "raise[d] serious constitutional problems" because they provided "for one agency or office of the federal government to issue administrative orders and take judicial enforcement action against another." Foreman Letter at 3. We would first note that the Administration positions on which the Air Force relies were merely drafts that are necessarily summary and tentative in nature Moreover, two of the draft statements are wholly unrelated to the issue of enforcement orders by one agency against another. *See* draft Floor Statement on H.R. 3781 (objecting to the requirement that the Department of Energy provide certain documents to Congress prior to any clearance by the President or Secretary of Energy); draft Floor Statement on H R. 3782 (objecting to the proposed creation of a Special Environmental Counsel independent of the President and the Department of Justice). The draft Floor Statement on H R 3785 did relate to the President's authority to resolve disputes within the executive branch, but that bill contained objectionable provisions that would have appeared to restrict the President's authority to establish a dispute resolution mechanism between EPA and other agencies This draft floor statement may thus be understood as seeking to preserve the President's opportunity to review Finally, the Air Force cites a letter by Assistant Attorney General John R Bolton, Office of Legislative and Intergovernmental Affairs, to Chairman John D Dingell of the House Subcommittee on Oversight and Investigations, December 20, 1985 ("Bolton Letter"), for the proposition that administrative orders to other executive agencies raise serious constitutional objections. We read the Bolton letter, however, simply as a discussion of the justiciability of suits between executive agencies, a subject we discuss below

[8] Exec Order No 12146, § 1-402, 3 C.F.R. 409 (1979). The mandatory provision of this Executive Order, by its terms, applies only to "Executive agencies whose heads serve at the pleasure of the President." *Cf* *id* § 1-401 (stating that "each agency is encouraged" to submit a dispute to the Attorney General when there is an interagency dispute over jurisdiction or a particular activity).

[9] *See* Exec Order No 12067, § 1-307 (1978)

[10] *See* Exec Order No. 12088, § 1-603, 3 C.F.R 244 (1978) (requiring the Director of OMB to "consider unresolved conflicts at the request of the Administrator"). This Order further provides that "[t]hese conflict resolution procedures are in addition to, not in lieu of, other procedures, including sanctions, for the enforcement of applicable pollution control standards." *Id* § 1-604

137

President been deprived of an opportunity to review the dispute. The statute expressly provides that the regulated agency be given a reasonable opportunity to respond to the Commission whenever the latter intends to impose a civil penalty. 42 U.S.C. § 2282(b). The NRC sent notice to the Air Force of its intent to impose a civil penalty on June 17, 1988. Thus, the statutory scheme provides, and the Air Force has received, sufficient opportunity to raise this dispute with the President. Moreover, before this penalty is collected from an unwilling agency, the NRC must refer the civil penalty order to the Attorney General for collection.[11] As we discuss below, this procedure may itself serve as a dispute resolution mechanism under the control of one of the President's subordinates.

Accordingly, we conclude that because the President has neither expressed any interest in, nor been precluded from, reviewing the NRC's orders imposing civil liability on executive branch agencies, there is no constitutional requirement that the NRC submit its decision to issue an order imposing civil fines on the Air Force to prior Presidential review.[12]

### III. Lawsuits Between Federal Agencies

The Air Force also contends that a lawsuit between the NRC and the Air Force would not be justiciable. It argues that because the lawsuit would be between two members of the executive branch, there would be no Article III "case or controversy," and therefore the federal courts could not adjudicate the dispute. We agree that substantial constitutional difficulties are raised by interagency lawsuits, but we believe that the Act permits resolution of your dispute with the NRC over any civil penalty without resort to such litigation.

The Office of Legal Counsel has long held the view that lawsuits between two federal agencies are not generally justiciable. *Proposed Tax Assessment Against the United States Postal Service,* 1 Op. O.L.C. 79 (1977). In this opinion, we stated that a dispute between the Postal Service and the IRS over the service's tax liability could not be entertained in court. We relied on the principle that the federal courts may only adjudicate actual cases and controversies. *Muskrat v. United States,* 219 U.S. 346 (1911). A lawsuit involving the same person as plaintiff and defendant does not constitute an actual controversy. *Lord v. Veazie,* 49 U.S. (8 How.) 251 (1850); *Cleveland v. Chamberlain,* 66 U.S. (1 Black) 419 (1862). This principle applies to lawsuits between members of the executive branch. *United States v. Shell Oil Co.,* 605 F. Supp. 1064, 1082 (D.

---

[11] *See* 10 C F R. § 2 205(h).

[12] The Air Force, of course, may urge the President to take the opportunity to review any issue relating to the proposed civil penalty. Assuming the President expressed an interest in such review, the question as to the extent of the President's authority to review and supervise the NRC would then be raised

Colo. 1985); *United States v. Easement and Right of Way over Certain Land in Bedford County, Tenn.*, 204 F. Supp. 837, 839 (E.D. Tenn. 1962); *Defense Supplies Corp. v. United States Lines Co.*, 148 F.2d 311, 312-13 (2d. Cir.), *cert. denied*, 326 U.S. 746 (1945).

The reasoning of our 1977 opinion applied to so-called "independent agencies." The opinion described the Postal Service as having "a degree of independence from the executive branch" and as "removed from direct political control." 1 Op. O.L.C. at 83. Our position is also consistent with the Supreme Court's most recent analysis concerning officials who do not serve at the pleasure of the President. *Morrison v. Olson*, 487 U.S. 654 (1988), indicates that despite the removal restrictions, such agencies exercise executive power and are members of the executive branch. *Id.* at 690 n.28, 691 ("[T]he real question is whether the removal restrictions [including those at issue in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935) and *Wiener v. United States*, 357 U.S. 349 (1958)] are of such a nature that they impede the President's ability to perform his constitutional duty.").

We have recognized that the Supreme Court has decided several cases that appeared to be between two members of the executive branch. 1 Op. O.L.C. at 80. On further examination, however, we have concluded that such suits are only nominally between two agencies: one of the executive agencies is not the "real part[y] in interest" but simply a stand-in for private interests. *Id.* at 81. The Supreme Court first made the "real party in interest" distinction in *United States v. ICC* , 337 U.S. 426 (1949), where the United States, in its role as a shipper, contended that charges imposed on it by railroads violated a statute. The United States unsuccessfully filed a complaint against the railroads before the Interstate Commerce Commission ("ICC"), and then brought an action in court to set aside the Commission's order. Pursuant to statute, the United States was made a defendant in its action to set aside the ICC order. Responding to the argument that the suit was nonjusticiable because the United States was suing itself, the Court stated:

> There is much argument with citation of many cases to establish the long-recognized general principle that no person may sue himself. Properly understood the general principle is sound, for courts only adjudicate justiciable controversies.... Thus a suit filed by John Smith against John Smith might present no case or controversy which courts could determine. But one person named John Smith might have a justiciable controversy with another John Smith. This illustrates that courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.

337 U.S. at 430. The Court then applied this standard to the dispute between the United States and the railroads:

> While this case is *United States v. United States, et al.*, it involves controversies of a type which are traditionally justiciable. The basic question is whether railroads have illegally exacted sums of money from the United States.... To collect the alleged illegal exactions from the railroads the United States instituted proceedings before the Interstate Commerce Commission.... This suit therefore is a step in proceedings to settle who is legally entitled to sums of money, the Government or the railroads.... Consequently, the established principle that a person cannot create a justiciable controversy against himself has no application here.

*Id.* at 430-31. Thus, the Court concluded that the lawsuit could be brought because the railroads, and not the United States, were in essence the real parties in interest as defendants. *Id.* at 432.

We believe that this reasoning explains other cases in which the Supreme Court has appeared to decide a case between two members of the executive branch. In these cases, one of the members of the executive branch was not the real party in interest, and therefore, the suit was, for purposes of justiciability analysis, actually between a private party and a government agency. In *Secretary of Agriculture v. United States*, 347 U.S. 645, 647 (1954), the Court was at pains to point out that the Secretary of Agriculture was appearing in the litigation in opposition to the ICC "on behalf of the affected agricultural interests," pursuant to specific statutory authorization. *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89 (1983), involved a dispute between the National Treasury Employees Union and the Bureau over reimbursement of a union representative for travel expenses. In *United States ex rel. Chapman v. Federal Power Comm'n*, 345 U.S. 153 (1953), the dispute was actually between the Secretary of Interior and a private power company. *See Ishverlal Madanlal & Co. v. SS Vishva Mangal*, 358 F. Supp. 386 (S.D.N.Y. 1973).[13] Other cases where a private party was the real party in interest include *Udall v. Federal Power Comm'n*, 387 U.S. 428 (1967) (dispute between nonfederal power companies and Secretary of Interior over the award of construction licenses); *Federal Maritime Bd. v. Isbrandtsen*,

---

[13] In *United States v. Marine Bancorp , Inc.*, 418 U.S. 602 (1974) and *United States v. Connecticut Nat'l Bank*, 418 U.S. 656 (1974), the United States had brought civil antitrust actions under section 7 of the Clayton Act challenging the proposed merger of banks in each of the respective cases The Comptroller of the Currency intervened in both actions as a party defendant pursuant to 12 U.S.C. § 1828(c)(7)(D). *See Marine*, 418 U.S. at 614 The Supreme Court did not address whether the intervention of the Comptroller General denied the Court federal jurisdiction The presence of private parties as the real parties-in-interest, however, distinguishes those cases from mere interagency litigation.

356 U.S. 481, 483 n.2 (1958) (dispute between shipper, joined by the United States, against Federal Maritime Board over shipping rates approved by the Maritime Board); *Interstate Commerce Comm'n v. Jersey City*, 322 U.S. 503 (1944) (dispute between municipality and Interstate Commerce Commission, with U.S. Price Administrator intervening on behalf of municipality); *Mitchell v. United States*, 313 U.S. 80 (1941) (dispute between private citizen, supported by a brief from the United States, and the ICC concerning dismissal of a discrimination complaint).

Finally, in *United States v. Nixon*, 418 U.S. 683 (1974), the Court found justiciable a lawsuit between the special prosecutor and President Nixon over the validity of a subpoena issued to acquire evidence in a pending criminal case. The Court concluded that "[i]n light of the uniqueness of the setting in which the conflict arises, the fact that both parties are officers of the executive branch cannot be viewed as a barrier to justiciability." *Id.* at 697. The Court noted that the President had been named as an unindicted coconspirator by the grand jury, *id.* at 687, and that the question of the validity of a subpoena to acquire evidence from a person in a pending criminal case was "traditionally justiciable." *Id.* at 697. In view of these special circumstances, we have understood the decision as based on the Court's view that the real party in interest was President Nixon in his private capacity.

Application of these principles strongly suggests that the dispute between the NRC and the Air Force is not justiciable. Both the NRC and the Air Force would be the real parties in interest in the lawsuit. The NRC seeks enforcement of its civil penalties against violators of its regulations. *See* 10 C.F.R. § 2.205; 10 C.F.R. pt. 2, app. C. The civil penalty would be imposed directly on the Air Force, which would be required to make the payment out of its appropriated funds. No private party has a direct interest in the lawsuit.

We believe, however, that this constitutional issue need not arise, because the framework of the Act clearly permits this dispute over civil penalties to be resolved within the executive branch, and without recourse to the judiciary. The Attorney General has the exclusive authority to collect civil penalties for the NRC, 42 U.S.C. § 2282(c), and therefore may exercise his discretion to resolve the dispute without resort to litigation.

Under 42 U.S.C. § 2282(a), the NRC is given the authority to impose civil penalties, and to "compromise, mitigate, or remit such penalties." The NRC, however, cannot enforce its decision to impose civil penalties, nor is there a procedure for judicial review of the decision. Rather, if the defendant disagrees with the NRC's decision, the civil penalties may be enforced or collected only by the Attorney General. Section 2282(c) provides that "the Attorney General is *authorized* to institute a civil action to collect" the civil penalty, thus indicating that he is not *required* to do so. 42 U.S.C. § 2282(c) (emphasis added). The section also expressly provides

141

that "[t]he Attorney General shall have the *exclusive* power to compromise, mitigate, or remit such civil penalties as are referred to him for collection." *Id.* (emphasis added). Thus, it is clear that the Attorney General has complete control concerning enforcement of the civil penalty.

The committee report accompanying the bill that was adopted by Congress as the Atomic Energy Act Amendments confirms the breadth of the Attorney General's discretion with respect to enforcement:

> The Attorney General would be authorized, but not required, to institute a civil action in a court of competent jurisdiction to collect the penalty. While the bill would confer on the Commission the power of compromise, mitigation, and remission of penalties, such power would reside exclusively with the Attorney General under the bill with respect to such civil penalties as are referred by the [Commission] to him for collection.
>
> ....
>
> The committee also has accepted the recommendation ... that the legislation provide discretion to the Department, after the matter has been referred to it by the Commission, to determine whether a civil action should be instituted, since that Department would have basic responsibility for that action.

S. Rep. No. 553, 91st Cong., 1st Sess. 11 (1969), *reprinted in* 1969 U.S.C.C.A.N. 1607, 1618-19.

Finally, it is also evident that the Attorney General's discretion extends to the underlying merits of the lawsuit. Because there is no judicial review of the NRC's initial decision to order payment of civil penalties, the collection suit itself is the vehicle for judicial review. Moreover, both the legislative history of the Act[14] and case law[15] indicate that the judicial

---

[14] In 1969 when the civil penalty provisions were enacted, the General Counsel for the Atomic Energy Commission testified before the Joint Committee on Atomic Energy that violations of the provisions were to receive de novo review. *See AEC Omnibus Legislation 1969: Hearings Before the Joint Comm on Atomic Energy,* 91st Cong , 1st Sess. 29-30 (1969) (statement of Joseph F Hennessey, General Counsel for AEC) That testimony provided as follows

> Section c. [42 U S C. 2282(c)] deals with the responsibility of the Attorney General. If after the Commission determines that a penalty should be imposed, the licensee fails to pay, the matter is referred to the Attorney General. He will determine whether a civil action for collection in Federal district court should be instituted. He is given exclusive authority to compromise, mitigate, or remit the civil penalty after the matter has been referred by the AEC.

> Under these provisions, an alleged violator is guaranteed an opportunity for a full hearing on the merits in Federal district court before any civil penalty may be collected from him.

*Id* Mr Hennessey further noted that, "[a]s we understand it, no agency has been given this type of
Continued

142

review takes the form of a trial de novo. Because the trial is not limited in scope, the Attorney General's prosecutorial discretion should be similarly plenary.

It is therefore clear that the Attorney General may exercise his discretion to ensure that no lawsuits are filed by the NRC against other agencies of the executive branch. If the Attorney General and the President determine that no civil penalties should be collected, the Attorney General may simply refrain from bringing a lawsuit. If the Attorney General determines that certain civil penalties are appropriate, however, the Attorney General would still not bring a lawsuit because of the constitutional problems noted above. Rather, procedures internal to the executive branch are adequate to resolve the dispute through the determination that the Air Force is liable.[16]

We thus conclude that a lawsuit between two agencies of the executive branch would involve substantial constitutional problems, but that the statutory scheme permits resolution of the interagency dispute within the executive branch.

## IV. Conclusion

We conclude that, unless the President seeks to review the NRC's decision, the NRC may issue an order imposing civil fines on the Air Force. We further conclude that any issue regarding the Air Force's liability for such fines may be resolved within the executive branch and without resort to litigation.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*

---

[14] (. .continued)
authority [to collect its own fines] because this would tend to cut off a judicial trial *de novo* of a 'penalty' action." *Id.* at 38

[15] *See United States Nuclear Regulatory Comm'n v Radiation Technology, Inc*, 519 F. Supp. 1266 (D.N.J. 1981). To determine the proper scope of judicial review, the district court examined the legislative history of NRC's penalty provisions and analogous civil penalty provisions of other regulatory agencies to conclude that Congress intended NRC's collection actions to receive de novo review. *Id* at 1275-86. *Radiation Technology* is the only reported case interpreting the NRC's civil penalty provisions.

[16] The Attorney General has authority to resolve conclusively any legal question on which he and the Air Force disagree *See* Exec. Order No. 12146, 3 C.F R 409 (1979) (mandating that the Attorney General resolve legal disputes between agencies whose heads serve at the pleasure of the President) Any remaining disagreement between the Attorney General and the Air Force could be submitted to the President for his resolution.

143