**CITY OF PHILADELPHIA**

v.

**STEPAN CHEMICAL COMPANY, et al.**

**CITY OF PHILADELPHIA**

v.

**CONGOLEUM CORPORATION, et al.**

**Civ. A. Nos. 81–0851, 83–5493.**

United States District Court, E.D. Pennsylvania.

Sept. 25, 1990.

See also 713 F.Supp. 1491.

Thomas J. Wamser, Joy J. Bernstein, Deputy City Solicitors, Philadelphia, Pa., for plaintiff.

Denis V. Brenan, John F. Stillmun, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Before me is the City of Philadelphia's motion for partial summary judgment and defendants' cross-motion for summary judgment. Plaintiff seeks a judgment stating that as a matter of law, it has met its burden under Section 107(a)(2)(B), of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(2)(B), of showing that the costs to remedy the city-owned Enterprise Avenue landfill were incurred consistent with the national contingency plan ("NCP") in effect at the time its costs were incurred. Defendants oppose the motion and instead seek a judgment that they are not liable for response costs incurred by plaintiff before the effective date of CERCLA, 42 U.S.C. § 9601 *et seq.*, on December 11, 1980, and that all response costs incurred after that date did not comply with the applicable NCP. As an initial

matter, the parties ask that I resolve the question of which of two NCP's promulgated by the Environmental Protection Agency ("EPA") between 1973 and 1982 to identify, contain, disperse, and remove hazardous substances from the environment applies to the various stages of remediation conducted by plaintiff between 1979 and 1985.

For the reasons that follow, I find that Congress intended to impose liability retroactively under CERCLA on responsible parties for pre-enactment response costs. I further find that the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 1510.1 *et seq.* ("1973 NCP"), promulgated by the EPA in 1973 in accordance with section 311(c)(2) of the Federal Water Pollution Control Act Amendments ("The Clean Water Act"), 33 U.S.C. § 1321(c)(2), provides the standard against which plaintiff's remediation activities up until July 16, 1982, should be measured.[1] Plaintiff's activities on and after July 16, 1982, will be evaluated in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.1 *et seq.* ("1982 NCP"), promulgated by the EPA on that date. As a matter of law, I conclude that the city's cleanup activities before July 16, 1982, were consistent with the 1973 NCP. In all other respects, I will deny the parties' cross-motions for summary judgment.

The facts of this case have been fully described in an earlier opinion in this case, *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982). Briefly, the city owned and operated a landfill on Enterprise Avenue. Each defendant contracted with either Lightman Drum Company or ABM Disposal Company to haul and dispose of hazardous industrial waste. During 1974 and 1975, Lightman and ABM gained access to the Enterprise Avenue landfill by bribing two city employees hired to guard the site and illegally dumped hazardous waste there. The city discovered the illegal dumping in 1979 and undertook to clean up the waste at its own expense. This lawsuit was subsequently brought to recover the city's response costs[2] and other consequential damages from defendants.

## I. CERCLA and the National Contingency Plans

CERCLA was enacted in 1980 to provide for "the cleanup of inactive hazardous waste disposal sites." Preamble to CERCLA, Pub.L. No. 96–510, 94 Stat. 2767. The House Committee on Interstate and Foreign Commerce reported that its intent in CERCLA was "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." H.R.Rep. No. 90–1016, 96th Cong., 2d Sess. 22, reprinted in 1980 U.S.Code Cong. & Admin.News 6119, 6125. In large part, congressional concerns over the magnitude of the hazardous waste disposal problem, its environmental consequences, the burdens it imposes—both health and financial—on the innocent public, and the inadequacies of existing law to control the danger, led to the promulgation of CERCLA. *See id.* at 6120.

Pursuant to section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), the

---

1. The NCP under the Clean Water Act was published on August 13, 1973 (38 Fed.Reg. 21888), revised on February 10, 1975 (40 Fed.Reg. 6282), and revised again on March 19, 1980 (45 Fed.Reg. 17832), 40 C.F.R. Part 1510 (1974 through 1982). These revisions did not alter the city's responsibilities in selecting and implementing a remediation program between 1979 and 1982; therefore, no discussion of these revisions is warranted. I will refer to the plan which guided the city's activities until July 16, 1982, as the "1973 NCP," despite the two revisions which predated publication of the 1982 NCP.

2. Response costs are the costs incurred in the cleanup and restoration of released hazardous substances. As defined by CERCLA, these costs include the costs of "removal" and the costs of "remedial" actions undertaken at a contaminated site. *See* 42 U.S.C. §§ 9601(23)–(25). Generally, removal actions are those intended for the short-term abatement of toxic waste hazards, while remedial actions are those intended to restore long-term environmental quality. *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd*, 851 F.2d 643 (3d Cir.1988).

city's cleanup activities must be consistent with specific guidelines published by the EPA, known as the national contingency plan. Cost recovery for activities deemed inconsistent with the EPA's guidelines is foreclosed by section 107(a)(4)(B).[3] In a recent opinion, I held that the city is not a "state" within the meaning of CERCLA, and therefore is not entitled to the presumption accorded states and the federal government under CERCLA section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), that its activities were consistent with the NCP. Rather, the city, as "any other person" under section 107(a)(4)(B) of CERCLA, has the burden of proving that its response costs were consistent with the applicable plan. *See City of Philadelphia v. Stepan Chemical Co.*, 713 F.Supp. 1484 (E.D.Pa. 1989).

Section 105 of CERCLA required the President to promulgate a national contingency plan within 180 days that would include, at a minimum,

> (2) methods for evaluating, including analyses of relative cost, and remedying any releases or threats of releases ...
>
> (3) methods and criteria for determining the appropriate extent of removal, remedy, and other measures ...
>
> . . . .
>
> (7) means of assuring that remedial measures are cost effective over the period of potential exposure....

42 U.S.C. § 9605(a). Congress intended for the President to revise and replace the 1973 NCP. *See* 126 Cong.Rec. S14965 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph); 40 C.F.R. § 300.2 (section 2 of the 1982 NCP). In Executive Order 12316, 42 FR 42237 (Aug. 20, 1981), the President delegated to the EPA the responsibility for the promulgation of the 1982 NCP and all other functions vested in the President under section 105 of CERCLA. *See id.* The EPA did not abide by the 180 day deadline established by Congress, and did not pub-

lish the 1982 amendments to the 1973 NCP until July 16, 1982. The 1982 NCP is codified at 40 C.F.R. § 300.1 *et seq.* Following a congressional review of sixty calendar days of continuous session as provided for in section 305 of CERCLA, 42 U.S.C. § 9655, the 1982 NCP was finally enacted on December 10, 1982.

Although the 1973 NCP was designed primarily to address the emergency cleanup of oil spills on the navigable waters and the high seas, the 1982 NCP did not alter the basic structure of the 1973 NCP. The 1982 NCP maintains the national and regional response teams established by the 1973 NCP to carry out the plan's mandates. 40 C.F.R. §§ 300.31–300.37. As with the 1973 NCP, the 1982 NCP stresses notification to the federal government of any hazardous discharge, and subsequent coordination between the responsible federal agency, the state, and the entity overseeing the cleanup efforts. *Id.* at §§ 300.22, 300.63. Once a discharge is reported, like the 1973 NCP, the 1982 NCP requires the federal agency to evaluate the extent of the problem, possible solutions, and the existence of other entities "ready, willing and able to undertake a proper response." *Id.* at § 300.64. Similarly, both the 1973 NCP and the 1982 NCP provide for cost recovery for removal actions and damages. 40 C.F.R. § 1510.55; 40 C.F.R. §§ 300.54, 300.69. The major difference between the 1973 NCP and the 1982 NCP is in the latter's delineation of the specific steps to be taken in evaluating and responding to a particular release problem. The 1973 NCP is silent as to the means to be employed by the lead agency in developing a response plan. The 1982 NCP, on the other hand, sets forth specific studies which must be conducted and factors which the lead agency must consider in formulating a response. Importantly, the 1982 NCP, unlike the 1973 NCP, requires the development and analysis of various alternatives for

---

**3.** In an earlier opinion, I inferred that consistency with the NCP is related only to the amount of cost recovery and not to the existence of a valid claim for relief. *See Stepan*, 544 F.Supp. at 1144 & n. 16. I have since reconsidered that decision in light of more recent opinions dis-

cussing the role of the NCP in cost-recovery actions. *E.g., Artesian*, 659 F.Supp. at 1291–92. Consistency with the NCP is plainly an element of the city's prima facie case. *See Stepan*, 713 F.Supp. 1484 (E.D.Pa.1989).

remediation. The goal of the process as described in the 1982 NCP is to select "the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare, or the environment." 40 C.F.R. § 300.68(j).[4]

## II. *The City's Cleanup Activities*

"Phase I" of the city's remediation efforts began in early 1979 when the city performed an exploratory excavation at the Enterprise site. Samplings were taken from numerous waste-containing drums buried at the site which confirmed the presence of chemical wastes. Stipulation of Facts ("Stip.") at ¶¶ 1–19. The city hired Roy Weston Associates, Inc., to perform a complete assessment of the damage to and risks posed by the deposits and to recommend a future course of action. Stip. at ¶ 27. Although Weston concluded that "[n]atural site conditions were favorable for in-situ control of the Enterprise site," Stip. at ¶ 58(g), the EPA and the Pennsylvania Department of Environmental Resources ("DER") rejected Weston's proposal. Stip. at ¶¶ 66, 72. Adopting the recommendations of the EPA and DER, the city decided that its cleanup activities would include locating, removing, and disposing of all contaminated drums and contaminated soil from the site, followed by an environmentally sound closure of the site to ensure its viability for future waste management. Stip. at ¶¶ 122–124. Between June and November of 1981, the city engaged in a ground penetration survey of the Enterprise site to locate contaminated drums. Stip. at ¶¶ 177–182. In April of 1982, the city selected D'Appolonia Waste Isolation, Inc., a waste management company, to remove and transport the contaminated drums. Stip. at ¶ 200. On June 19, 1982, D'Appolonia began evacuation of the site. Stip. at ¶ 209. The city temporarily ceased Phase I removal before completion between September and October of 1982

when its funds were near depletion. Stip. at ¶¶ 268–269. The city then engaged in interim closure and containment of the site until June of 1984, Stip. at ¶¶ 274–296, when the city obtained federal funding under the Superfund program for the remainder of the removal activity and for remedial closure and long-term maintenance of the site ("Phase II"), Stip. at ¶ 345. In cooperation with the EPA and the DER, the city began Phase II of the cleanup in July of 1984. Stip. at ¶ 354. By November, 1984, hazardous waste removal and site closure activities were complete, Stip. at ¶ 374, although final erosion controls and a cover for the site were not installed until after inspection by the EPA in March of 1985. Stip. at ¶¶ 375–77.

## III. *Retroactivity of CERCLA Cost Recovery*

Defendants maintain that the city is not entitled to damages under CERCLA for response costs incurred before the statute's enactment on December 11, 1980. Section 302(a) of CERCLA, 42 U.S.C. § 9652(a), states that "[u]nless otherwise provided, all provisions of this chapter shall be effective on December 11, 1980." This section, however, is "merely a standard 'effective date' provision that indicates the date when an action can first be brought and when the time begins to run for issuing regulations and doing other future acts mandated by the statute." *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726, 732 (8th Cir.1986) (quoting *United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1075 (D.Colo.1985)), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). Although CERCLA does not expressly provide for retroactivity, it is clear from the statutory language that Congress intended for CERCLA to have retroactive effect. The liability provision of CERCLA, section 107, imposes liability on "any person who ... arranged for disposal ... of hazardous substances ... from which there

---

**4.** On November 20, 1985, the EPA revised the 1982 NCP to clarify portions of the plan and to modify others. The parties do not contend that the 1985 NCP should in any way govern the actions taken by the city since remediation at the Enterprise site was completed before the effective date of the 1985 plan.

is a release, or a threatened release which causes the incurrence of response costs." 42 U.S.C. § 9607(a)(3), (4). Defendants do not dispute and courts have systematically held that CERCLA imposes liability for acts within its scope which took place before its effective date. Defendants appear to be making the anomalous argument that while the statute might impose liability on them for their pre-enactment conduct, it does not authorize the city to collect any damages for this liability. Hence, while they may be deemed responsible for pre-enactment toxic dumping, they cannot be held accountable for it. I reject defendants' interpretation of the statute in favor of the interpretation of the Eighth Circuit and the District of Colorado, which I find to be consistent with CERCLA's remedial purpose.[5]

In *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726 (8th Cir.1986), the Eighth Circuit reversed a trial court ruling limiting the right to recovery of pre-enactment response costs. The panel adopted in its entirety Judge Carrigan's reasoning in *United States v. Shell Oil Co.*, 605 F.Supp. 1064 (D.Colo.1985), and quoted extensively from that opinion. 810 F.2d at 732–37. I need not repeat the exhaustive analyses of both Judge Carrigan and the Eighth Circuit, but will simply address the highlights of those opinions. I conclude, as they did, that the CERCLA statutory scheme is "overwhelmingly remedial and retroactive." *Northeastern Pharmaceutical*, 810 F.2d at 733; *Shell Oil*, 605 F.Supp. at 1077–79 (discussing legislative history of CERCLA). Construing section 107(a) to preclude recovery of pre-CERCLA cleanup costs would "carve out an exception to the general retroactive scheme of the statute," where, as here, the city's response began before the effective date of the statute. *Shell Oil*, 605 F.Supp. at 1076. In enacting section 107, Congress undeniably intended "that those responsible for any ... environmental harm ... bear the costs of their actions." Senate Report from the Committee on Environmental and Public Works at 13. Additionally, given the often irreversible damage caused by the movement of improperly deposited hazardous wastes, CERCLA was designed to promote prompt response action. Congress hardly could have meant to protect human health, the environment, and "the public fisc by imposing liability on responsible parties, yet except the sites where response had already commenced because the situations were the most imminently threatening." *Shell Oil*, 605 F.Supp. at 1076.

Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), sets forth three types of liability: (A) response costs incurred by the United States or a state that was not inconsistent with the NCP; (B) any other necessary response costs incurred by any other person that are consistent with the NCP, and (C) natural resource damages. At section 107(f) and 111(d)(1) of CERCLA, 42 U.S.C. §§ 9607(f), 9611(d)(1), Congress specifically precludes recovery of natural resource damages and claims for such damages against the Superfund if the release of hazardous substances and the resulting injury occurred wholly before the statute's enactment. The provisions authorizing recovery of costs by the federal and state governments, CERCLA § 107(a)(4)(A), and by "any other person," CERCLA § 107(a)(4)(B) (applicable to the defendants

---

5. The Third Circuit has not yet decided whether CERCLA provides for recovery of pre-enactment response costs. Defendants urge me to adopt the reasoning of Judge Clarence Newcomer in *United States v. Wade*, 20 E.R.C. 1849, 1850–51 (E.D.Pa.1984), in which he acknowledges that CERCLA provides for recovery of post-enactment response costs caused by pre-enactment dumping, but concludes that Congress did not intend to allow recovery for cleanup activities which predate CERCLA. As the court in *Shell Oil* noted, "[s]uch an interpretation would penalize [the responding party] for prompt response and provide an undeserved windfall for the parties who had created, then abandoned, some of the most egregious sites." 605 F.Supp. at 1076–77. With all due respect to Judge Newcomer, given Congress' clear intent in enacting CERCLA "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites," 1990 U.S.Code Cong. & Admin. News at 6125, I conclude that Congress would not have intended such a result.

in this case), contain no such time limitations. I agree with Judge Carrigan and with the Eighth Circuit that " 'Congress implicitly authorized retroactive application of sections 107(a)(4)(A) and (B) by affirmatively limiting retroactive application of the third category of liability, damages to natural resources, section 107(a)(4)(C).' " *Northeastern Pharmaceutical*, 810 F.2d at 736 (quoting *Shell Oil*, 605 F.Supp. at 1076).

I am similarly persuaded by Judge Carrigan's analysis that the requirement that response costs be consistent with the NCP in no way precludes a finding that such costs can be recovered retroactively. The 1982 NCP does not mandate limitation of recovery to costs incurred after CERCLA's enactment. Although the 1973 NCP was promulgated under the Clean Water Act and not CERCLA, it provided the necessary guidance to individuals and to the federal, state, and local governments who undertook cleanup of hazardous wastes before CERCLA was enacted. Like the 1982 NCP, the 1973 NCP provided for cost recovery and set forth a framework which courts would utilize to determine whether responsible parties could be held accountable for the cost of response actions, depending on whether such actions were consistent with the NCP's provisions. The consistency requirement merely addresses the *nature* of the response actions for which responsible parties may be held liable and for which costs may be assessed, not the *timing* of such action. Although both the *Shell Oil* and the *Northeastern Pharmaceutical* courts declined to decide whether the 1973 or the 1982 NCP would apply to response activities undertaken before CERCLA was enacted,[6] Judge Carrigan concluded that regardless of which NCP applies, nothing in CERCLA precludes the recovery of costs for pre-CERCLA activities which are *later* determined to be consistent with an applicable NCP. 605 F.Supp. at 1074–75.

6. As discussed *infra* at section IV, I have concluded that the 1973 NCP applies to remedial

## IV. The 1973 NCP Applies to Response Activities Before July 16, 1982

■ As discussed earlier, although section 105(a) of CERCLA, 42 U.S.C. § 9605(a), directed the President to revise the 1973 NCP and republish it "[w]ithin one hundred and eighty days after December 11, 1980," *i.e.*, by June 9, 1981, the revised NCP was not published until over one year after that, on July 16, 1982, following an order by the United States District Court for the District of Columbia in *Environmental Defense Fund, Inc. v. Gorsuch*, 17 E.R.C. 1099 (D.D.C.1982). The defendants maintain that because of the explicit 180 day provision, Congress did not intend for the 1973 NCP to apply to remedial activities undertaken beyond this statutory deadline. Instead, defendants contend that the standards under the 1982 NCP should apply to the city's cleanup activities during the thirteen month "gap" period between the expiration of the statutory deadline and the publication of the 1982 NCP. The defendants offer no authority for their contention that Congress meant for responding parties to prophesy the revisions to the 1973 NCP that the EPA would eventually make.

In section 101(31) of CERCLA, 42 U.S.C. § 9601(31), Congress defines the "national contingency plan" as it is referenced throughout the statute as "the national contingency plan published under section 1321(c) of Title 33 [the 1973 NCP] or revised pursuant to section 9605 of this title." In sections 105 and 107 of CERCLA, 42 U.S.C. §§ 9605, 9607, the NCP became the benchmark by which hazardous waste cleanup activities would be measured and the liability of responsible parties determined. At section 105 of CERCLA, Congress set forth a list of criteria to be included in the revised NCP and then concluded that *"following publication of the revised national contingency plan,* the response to and action to minimize damages from hazardous substances releases shall, to the greatest extent possible, be in accordance with the provisions of the plan."* (empha-

activities which predate the publication of the 1982 NCP on July 16, 1982.

sis added). Congress thereby mandated that publication of a revised NCP precede its application. Until such publication, however, the only plan to which Congress could have been referring in section 107(a)(4)(A) and (B) is the 1973 NCP, as Congress made clear in section 101(31) when it defined the term "national contingency plan."

Section 302 of CERCLA lends further support to the effectiveness of the 1973 NCP during the statutory "gap" period. Section 302 provides that any "[a]ny regulation issued pursuant to section 1321 of Title 33 [e.g., the 1973 NCP], which is repealed or superseded by [CERCLA] and which is in effect on the date immediately preceding the effective date of [CERCLA] shall be deemed to be a regulation issued pursuant to the authority of [CERCLA] and shall remain in full force and effect unless or until superseded." 42 U.S.C. § 9652(b). Hence, until superseded by the 1982 NCP, the 1973 NCP remained in effect as if issued under CERCLA.

Defendants suggest that the city should have ceased all work at the Enterprise site 180 days after CERCLA went into effect and waited until the EPA published the revised NCP before resuming remediation. According to defendants, the city acted at its own peril by proceeding with cleanup activities in the absence of a revised NCP. Once again, defendants credit the city with formidable intuitive powers. After the 180 day deadline had expired, the city did not know when the EPA would issue a new plan. Had the city chosen to wait, it might have waited indefinitely; indeed, it took a federal lawsuit and a court order to prompt the EPA into action. The defendants' proposed approach would have resulted in an indefinite delay in addressing a serious environmental and public health hazard, as well as the likelihood of further contamination and higher response costs. As I stated in an earlier opinion in this case, CERCLA "is designed to achieve one *key objective*—to facilitate the *prompt cleanup* of hazardous dumpsites by providing a means of financing both governmental and private responses and by placing the ultimate financial burden upon those responsible for the danger." *Stepan*, 544 F.Supp. at 1142–43 (emphasis added). The defendants' approach contravenes the intended purpose of CERCLA by giving undue priority to the budgets of the various generators of hazardous wastes at the expense of the environment, the public health, and the public dollar. When the city continued to plan and to implement a response during the statutory "gap" period, the only risk it assumed was that its activities would later be deemed inconsistent with the 1973 NCP.

The application of the 1973 NCP to the thirteen month "gap" period is consistent not only with the language of CERCLA and its legislative history, but also with the decisions of those courts which have considered the issue of which national contingency plan—the 1982 NCP in its original form or in its revised form, the 1985 NCP—should apply to response actions undertaken between the effective dates of each plan.[7] In *Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1575 (E.D. Pa.1988), Judge James McGirr Kelly held that "[c]onsistency with the NCP should be determined in light of the NCP in effect at the time the response costs were incurred, not when the response actions were initiated or when the claims for cost recovery are evaluated." *Accord Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 891 (9th Cir.1986); *N.L. Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986); *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1294 (D.Del.1987), *aff'd on other grounds*, 851 F.2d 643 (3d Cir.1988). I conclude that the city's response activities which predate publication of the final version of the 1982

---

7. One case, *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100 (D.Minn.1982), in rejecting defendant's argument that Congress intended for adoption of the 1982 NCP to be a prerequisite to bringing a suit under section 107 of CERCLA, implied, without explicitly stating, that the NCP which would apply to defendant's response activity before publication of the final version of the 1982 NCP is the 1973 NCP: "Congress intended that the existing plan [the 1973 NCP] provide what guidance it could in preparing responses until the revised plan was formulated." *Id.* at 1116.

NCP on July 16, 1982, should be evaluated according to their consistency with the 1973 NCP.

### V. The 1982 NCP Applies to Response Activities Between July 16, 1982 and December 10, 1982

■ Section 305 of CERCLA, 42 U.S.C. § 9655, provides for a waiting period of sixty calendar days of continuous session of Congress after publication of the final version of the NCP on July 16, 1982, to enable Congress to review and, if necessary, disapprove or veto provisions of the plan. The waiting period expired on December 10, 1982, without official comment from either the House or the Senate, and the 1982 NCP was thus approved on that date. Although the parties agree that the city's remedial activities after December 10, 1982, should be evaluated according to the provisions of the 1982 NCP, they disagree about which plan applies to the city's activities between July 16, 1982, and December 10, 1982. The city claims that the 1973 NCP should apply. The defendants, of course, maintain that the more onerous and exacting 1982 NCP should be utilized. Although there is little authority on which to rely,[8] I conclude that the plain language of the statute and Congress' acknowledged dissatisfaction with the limited coverage of the 1973 NCP requires that the 1982 NCP apply to the time between July 16, 1982, and December 10, 1982.

> Section 105(a) of CERCLA clearly states: *Following publication of the revised national contingency plan, the response to an actions* to minimize damage from hazardous substances *shall,* to the greatest extent possible, be in accordance with the provisions of the plan.

42 U.S.C. § 9605(a) (emphasis added). This statutory language specifically refers to the publication of the 1982 NCP rather than to the effective date. By using the word "shall" instead of "may," Congress must have intended for responding parties to comply with the revised plan even while the legislators were reviewing and commenting on it. Although the 1982 NCP was not formally codified until the waiting period had expired, the city was clearly on notice as of July 16, 1982, that Congress intended for its activities to be consistent with the EPA's published version of the plan, and that only a legislative veto of the published plan or a congressional amendment to section 305 of CERCLA would alter this result.[9]

This interpretation makes sense in light of the Congressionally acknowledged limitations to the Clean Water Act, and hence, of the 1973 NCP promulgated thereunder, to address the hazards presented by the disposal of environmental pollutants on land. The Clean Water Act, as its title connotes, was designed specifically to address problems associated with the discharge of hazardous substances, oil, in particular, on navigable waters and the high seas. *See* 40 C.F.R. § 1510.1–1510.3. Even the Resource Conservation and Recovery Act, Pub.L. No. 94–580, 90 Stat. 2795, codified as an amendment to the Solid Waste Disposal Act, 42 U.S.C. § 6901 *et seq.* failed to incorporate a remedy for many unregulated aspects of waste disposal on land and illegal dumping. CERCLA and the 1982 NCP were enacted specifically to provide for the cleanup of inactive hazardous waste disposal sites. In the House and Senate reports which preceded the passage of CERCLA, the legislators discussed at length the deficiencies of existing environmental statutes and regulations in curbing the dangers associated with the discharge and disposal of hazardous wastes on land. *See* H.R.Rep. No. 96–1016, 96th

---

8. My own legal research uncovered no cases directly addressing this issue. The legislative history offers no guidance.

9. This type of legislative veto provision was later deemed unconstitutional in *Immigration & Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), a case challenging a provision in the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2), which required Congress to review decisions of the Attorney General granting requests for suspension of deportation proceedings. Because *Chadha* was not decided until after the sixty day waiting period for the 1982 NCP had expired, however, its logic is unavailing to the defendants in this case.

Cong., 2d Sess. 22 (1986) *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6125; S.Rep. No. 96–848, 96th Cong., 2d Sess. (1980); *United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1070–71 (D.Col.1985).

Although the 1973 NCP, as the congressionally-mandated NCP in effect until publication of the 1982 NCP, *See* 42 U.S.C. §§ 9601(31), 9605, did not provide a method for arriving at a response plan or for selecting cost-effective, yet environmentally-sound, alternatives, it did offer substantial guidance to those preparing responses and to the courts in determining whether liability could attach against responsible parties for remedial activities undertaken. Once the 1982 NCP was published, however, the steps that the EPA expected responsible parties to take in evaluating, planning, and implementing response activities, codified as phases I through VII of the 1982 NCP at 40 C.F.R. § 300.63–300.69, were made public. Ensuring that responses to hazardous substance releases be in accordance with the newly published 1982 NCP was not only required by Section 105(a) of CERCLA, but it also made sense in light of the obvious shortcomings of the 1973 NCP. Given the EPA's pronouncement in March of 1982 that it had drafted a proposed plan in accordance with section 105 of CERCLA, and given the thirty-day public comment period which preceded publication of the final version of the 1982 NCP, the city is hard-pressed to claim that it was unaware of the new regulations as of July 16, 1982. Indeed, the city contends only that it would be unjust and contrary to congressional intent to hold it to a standard embodied in a statute not yet codified. Under the aforementioned circumstances, I conclude that it would be neither unjust nor contrary to congressional intent.

Given the fact that the city had already begun excavation and removal of contam-inated drums from the Enterprise site on July 16, 1982,[10] I will evaluate its remedial activities from July 16, 1982, *forward,* under the 1982 NCP. Any activities which the city arguably should have implemented or considered before excavation pursuant to the requirements of the 1982 NCP, but did not, will not constitute inconsistencies with the plan *unless* such activities were mandated by the 1973 NCP as well. There is nothing in either the language of CERCLA or the 1982 NCP which requires a responsible party to cease response activities upon publication of a revised NCP and then backtrack to the first step of its remediation efforts to ensure that activities completed before publication comply with the new plan. Such a requirement would extend backwards the effective date of the 1982 NCP, a result I previously concluded Congress did not intend. Hence, arguments by defendants that the city failed to determine the extent of the remedy required before selecting a response project, that the city failed to develop a list and cost analysis of alternatives before selecting a response project, that the city failed to select a cost effective remedy, that the city failed to perform a written risk assessment or feasibility study in connection with the remedy chosen, and that the city failed to make an independent analysis to determine whether its proposed plans complied with federal law are moot, inasmuch as these activities are not required under the 1973 NCP and would have taken place before D'Appolonia began excavation.

## VI. *The City's Response Activities Up to July 16, 1982, Complied with the 1973 NCP*

■ Based on the evidence submitted in the parties' Stipulation of Facts, I conclude that the city has established, as a matter of law, that its response to the discharge at the Enterprise site between the date of

---

10. "D'Appolonia [Waste Isolation, Inc.] was awarded the contract to do Phase I work for $4,975.000.00 on April 17, 1982." Stip. at ¶ 200.

"On May 10, 1982, a meeting was held between the City, Weston and representatives of EPA and DER at which Mr. Cushing of Weston explained the proposed work to be done under the contract." Stip. at ¶ 204.

"On May 22, 1982, D'Appolonia was issued the Notice to Proceed with Phase I work." Stip. at ¶ 205.

"On June 19, 1982, D'Appolonia began actual excavation." Stip at ¶ 209.

discovery in late 1978 and the date the 1982 NCP was published on July 16, 1982, was consistent with the 1973 NCP. The 1973 NCP establishes a multi-prong cleanup process. A hazardous discharge or potential discharge must first be reported to an appropriate federal agency. 40 C.F.R. §§ 1510.51, 1510.63. The 1973 NCP then calls for an immediate investigation and evaluation to determine the magnitude and severity of the discharge or threat, the feasibility and effectiveness of removal, and the need to initiate a response action. 40 C.F.R. § 1510.52. Once an investigation is complete, "defense actions should begin.... to protect public health and welfare." *Id* at § 1510.53. Efforts to contain and counteract the danger should include analyzing water samples to determine the source and spread of pollutants, implementing procedures to control the source of discharge, and using chemicals or other materials to restrain the spread of pollutants. *Id.* Following or in conjunction with "defensive actions," the 1973 NCP mandates mitigation, cleanup, and disposal of hazardous wastes. *Id.* at §§ 1510.54, 1510.63.

Consistent with the first requirement of the 1973 NCP, upon discovery of the deposits at the Enterprise site in December of 1978, employees of the Water Department notified Jack Schram of the EPA that potentially toxic and hazardous materials might be located at the site. Stip. at ¶ 5. The city next hired three equipment contractors to begin exploratory excavations for contaminated drums, Stip. at ¶ 6, in accordance with section 1510.52(a) of the 1973 NCP. The EPA took samples from recovered drums and from the surface water for analysis. Stip. at ¶¶ 12,13. The city created a "drum graveyard" for the recovered drums consisting of a natural clay bottom and incinerator residue for the sides. Stip. at ¶ 9. The "graveyard" restrained the further spread of contaminants. 40 C.F.R. § 1510.53. One month after the completion of the exploratory evacuation, in February of 1979, the city hired Weston Associates to conduct a formal and complete investigation of the site and to recommend an appropriate future course of action. Stip. at ¶¶ 18–28. Weston's investigation, analysis, and recommendation were consistent with 40 C.F.R. § 1510.52.

Because the EPA and DER did not agree with Weston's recommendations for in-situ remediation of the site, Weston developed and drafted alternative remedies and provided the city with an environmental assessment and cost effectiveness analysis for each alternative. Stip. at ¶¶ 91–101. The EPA and DER commented extensively on Weston's proposals and recommended that the city adopt the Weston alternative which called for drum removal and excavation as opposed to in-situ upgrading and closure of the site. Stip. at ¶¶ 103, 109, 113. The city accepted the recommendations of the EPA and DER in September of 1980, Stip. at ¶¶ 118–120, after "determin[ing] the feasibility of removal ... and assess[ing] the effectiveness of removal actions." 40 C.F.R. § 1510.52(a).

The city's "defensive actions" followed. Weston first engaged in a ground penetrating test plot survey to map out the location of buried drums. Stip. at ¶¶ 175–181. Next, Weston developed protocols for handling "hot-spot" contamination, and drafted specifications for the work to be done at the site. Stip. at ¶¶ 188, 189. Weston's survey, protocols, and specifications were consistent with the requirements of 40 C.F.R. § 1510.53 ("defensive actions").

D'Appolonia Waste Isolation, Inc., implemented Weston's proposal and conducted Phase I of the evacuation, which included a search for drum pockets, removal of contaminated drums and soil, and off-site disposal. Stip. at ¶¶ 206–246. The city kept the EPA and DER apprised of D'Appolonia's progress. Stip. at ¶ 256. In the absence of specific guidelines in the 1973 NCP for the formation and implementation of a response plan, I find that the city's efforts to mitigate, cleanup, and dispose of the hazardous wastes at the Enterprise site through the work of D'Appolonia Waste Isolation, Inc., was consistent with the mandates of 40 C.F.R. § 1510.63 ("response actions").

The 1973 NCP calls for the appointment of a "federal" on-scene coordinator to di-

rect the "federal" response. *Id.* at §§ 1510.5(k), 1510.36. The defendants assign as error the absence of a federal on-scene coordinator in Phase I of the city's response. What the defendants fail to realize is that *consistency* with the NCP is different from, and less onerous than, *compliance* with the national contingency plan. CERCLA demands only the former. The 1973 NCP contemplates a federal response action, coordinated and implemented by federal agencies. *See id.* at § 1510.22. The city undertook remediation on its own, in cooperation with, though not under the auspices of, the EPA. Nonetheless, representatives of the EPA were frequently on-site conducting evaluations, *e.g.,* Stip. at ¶¶ 11, 12, and the EPA was called upon to scrutinize and to approve *every* step of the city's cleanup project. Representatives from the Water Department met and consulted with representatives from EPA to keep the federal agency apprised of the progress at the site and to elicit advice. *See* Stip. at ¶¶ 65–70, 74–79, 85, 90, 102, 103, 118, 121, 125, 127, 130, 144–146, 152, 154–169, 188–190. In every instance where the EPA disagreed with the city's course of action, the city amended its plans in accordance with EPA directives. Hence, the city's coordination of response activities in conjunction with the EPA was *consistent* with 40 C.F.R. § 1510.36, despite the absence of a designated "federal" on-site coordinator.[11] The city's activities from the initiation of its response up to July 16, 1982, were consistent, as a matter of law, with the 1973 NCP.

VII. *Issues of Material Fact Remain as to the City's Consistency with the 1982 NCP after July 16, 1982*

■ I will deny the parties' cross-motions for summary judgment on the issue of whether the city's response activities after July 16, 1982, (the remainder of "Phase I" remediation, interim closure, and "Phase II" remediation) were consistent with the 1982 NCP. There are issues of material fact in dispute, the resolution of which are relevant to the question of the defendants' liability.

For example, section 300.69 of the 1982 NCP requires that "[d]uring *all* phases [of remediation], documentation shall be collected and maintained to support all actions taken under this Plan, and to form the basis for cost recovery." 40 C.F.R. § 300.69. Defendants dispute that the appropriate documentation was "collected and maintained." Although documentation concerning remedial alternatives and the cost effectiveness of various remedies was not required during Phase I, *see supra* at 284–285, documentation of D'Appolonia's work after July 16, 1982, was required. It is unclear what, if any, documentation was maintained of D'Appolonia's work and of the interim closure, and whether any documentation which was maintained was "sufficient to provide the source and circumstances of the condition ... accurate accounting of ... costs incurred, and impacts and potential impacts to the public health, welfare and environment." 40 C.F.R. § 300.69. There are numerous references in the Stipulation of Facts to the city's "Phase I Report." *See* Stip. at ¶¶ 191–281. I do not have a copy of the Phase I Report and therefore cannot ascertain whether it satisfies the requirements of the 1982 NCP. I also do not have a copy of the city's Phase II Report, in which the work performed to secure and monitor the site during interim closure was apparently doc-

---

11. The defendants also maintain that the city failed to implement a "local contingency plan" in accordance with 40 C.F.R. §§ 1510.41, 1510.-42. On the contrary, there were two different local contingency plans in effect during Phase I of the city's response, the first published in 1973 ("1973 LCP"), and the second published in 1981 ("1981 LCP"). The 1973 LCP refers directly to the national contingency plan and thus imposes no additional burdens on the city. The 1981 LCP deals solely with a federal response to an emergency situation, and thus provides no guid-ance not already contained in the 1973 NCP. Both local plans emphasize coordination among federal, state, and local officials in responding to an environmental hazard, a criterion the city clearly satisfied throughout its remediation efforts. *See* Exhibits A and B attached to Plaintiff's reply in Support of Partial Summary Judgment (1973 and 1981 LCPs). The defendants' argument concerning the city's alleged failure to implement a local contingency plan has no merit.

umented; hence, issues remain concerning the consistency of the Phase II Report with the 1982 NCP. Additionally, the defendants allege that D'Appolonia's crew committed numerous errors during excavation by breaking drums and spilling their contents. The extent to which D'Appolonia exacerbated the hazards at the Enterprise site and whether its negligence, if any, constitutes an inconsistency with the 1982 NCP is disputed and was not fully briefed by the parties.

When the city sought federal funding under the Superfund program in mid–1983, the EPA required it to develop a feasibility study and a risk assessment analysis for the proposed Phase II remediation which would include a comparison of the environmental impact and cost effectiveness of various remediation alternatives. Stip. at ¶¶ 302–310. The city does not dispute that these studies had to be consistent with the 1982 NCP. There are issues of material fact outstanding, however, which preclude a decision at this time as to whether the remedy chosen by the city and the EPA for Phase II remediation was "cost-effective" in light of the environmental and public health dangers posed by the contamination. The need for expert testimony on this issue is clear. Additionally, I cannot ascertain from either the Stipulation of Facts or from the parties' briefs whether the errors allegedly committed by D'Appolonia's crew during Phase I made the interim closure and Phase II remediation more costly and less environmentally sound, and whether such alleged errors would render interim closure and Phase II remediation partly or wholly inconsistent with the 1982 NCP.

## VIII. *Conclusion*

Plaintiff is entitled to partial summary judgment that CERCLA applies retroactively to its pre-enactment response costs and that its response activities up to July 16, 1982, were consistent with the 1973 NCP. Because disputed issues of material fact are outstanding, the parties' cross-motions for summary judgment must be denied, however, as to the consistency of the city's activities after July 16, 1982, with the 1982 NCP. An appropriate order follows.

## ORDER

AND NOW, this 25th day of September, 1990, in accordance with the accompanying memorandum, it is hereby ordered:

1. The city's motion for partial summary judgment is granted in part and denied in part.

2. Defendants' joint motion for summary judgment is granted in part and denied in part.

3. As a matter of law, CERCLA applies retroactively to pre-enactment response costs incurred by the city.

4. As a matter of law, the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 1510.1 *et seq.* ("1973 NCP"), applies to the city's response activities up to July 16, 1982.

5. As a matter of law, the revised National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.1 *et seq.* ("1982 NCP"), applies to the city's response activities on and after July 16, 1982.

6. As a matter of law, the city's response activities up to July 16, 1982, were consistent with the 1973 NCP. Partial summary judgment is entered in favor of plaintiff and against defendants as to the issue of the city's consistency with the 1973 NCP up to July 16, 1982.

7. Disputed issues of material fact remain as to whether the city's response activities on and after July 16, 1982, were consistent with the 1982 NCP, thereby precluding partial summary judgment in favor of or against any party.

It is further ordered:

1. A settlement conference with Magistrate Naythons is scheduled for October 9, 1990, at 10:30 a.m. in Room 4617 United States Courthouse, Philadelphia, Pa.

2. A pretrial conference is scheduled for November 5, 1990, at 10:00 a.m. in courtroom 6A. The parties shall meet before the pretrial conference to agree on an agenda for the conference, a copy of which

they will provide to me by November 1, 1990.

3. Trial is scheduled for November 13, 1990, at 9:30 a.m. in courtroom 6A.

4. On or before November 5, 1990, the parties will exchange with each other and submit to me an index of the exhibits they intend to introduce at trial. The parties will also exchange and submit to me by that date a list of witnesses who will testify at trial and the approximate time for direct examination of each witness. Plaintiff shall use the numbers 1–999 to label its exhibits. The numbers 1000–1099, 1100–1199, 1200–1299, etc., are assigned to each individual defendant to label its exhibits, based upon the order in which defendants intend to proceed at trial. Unless a party files an objection by November 12, 1990, the need to prove authenticity and compliance with Fed.R.Evid. 803(6) will be deemed waived.

5. The parties shall submit pretrial memoranda prepared in accordance with Local Rule 21(c) and requests for findings of fact and conclusions of law on or before November 9, 1990. Two or more defendants may file a joint pretrial memorandum.

6. Plaintiff's motion to strike defendants' jury demand is granted. There is no right to a jury trial in CERCLA cases since the relief requested is essentially equitable in nature. *See United States v. Northeastern Pharmaceutical & Chemical Co., Inc.*, 810 F.2d 726, 749 (8th Cir.1986); *Wehner v. Syntex Corp.*, 682 F.Supp. 39, 40 (N.D.Cal. 1987). There is no Seventh Amendment right to a jury trial in an equitable action. *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987).

7. The following outstanding motions are denied without prejudice to the parties' right to raise issues contained therein at the time of trial:

i) City of Philadelphia's motion for summary judgment as to the liability of Apollo Metals, Inc.;

(ii) City of Philadelphia's motion for summary judgment as to the liability of Gates Engineering Company;

(iii) Gates Engineering Company's motion for summary judgment as to liability;

(iv) City of Philadelphia's motion for summary judgment as to the liability of CPS Chemical Company;

(v) CPS Chemical Company's motion for summary judgment as to liability;

(vi) City of Philadelphia's motion for summary judgment as to the liability of Durabrand Products Company'

(vii) City of Philadelphia's motion to dismiss counterclaims;

(viii) Motions in limine of defendants Gates, Radiac, DELCORA, Tepper Enterprises to exclude from use at trial grand jury materials obtained by the city.

8. Any and all outstanding discovery motions are denied without prejudice to the parties' right to address remaining discovery disputes at the pretrial conference.